UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER PARCHMANN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>METLIFE, INC., STEVEN A. KANDARIAN, and JOHN C.R. HELE,<br><br>Defendants. | Civil Action No. 1:18-cv-00780-SJ-RLM<br><br><u>CLASS ACTION</u><br><br>Hon. Sterling Johnson, Jr.<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS


Page

INTRODUCTION ....................................................................................................2

JURISDICTION AND VENUE ..............................................................................6

PARTIES ................................................................................................................6

A. Lead Plaintiffs ....................................................................................................6

B. Defendants .........................................................................................................7

a. The Company .....................................................................................................7

b. Defendant Kandarian ..........................................................................................7

c. Defendant Hele ...................................................................................................8

d. Defendant Wheeler .............................................................................................9

SUBSTANTIVE ALLEGATIONS .........................................................................11

A. Pension Risk Transfers Are a Core Element of MetLife's Business .....................11

B. MetLife Employed an Admittedly Improper Practice During the Class Period for Locating Pension Risk Transfer Annuitants .......................................15

C. The 2012 Settlement Agreement Demonstrates that Defendants Knew, or Recklessly Disregarded, that Their Practice of Confirming Annuitants' Living Status Through Mailing Two Form Letters and Awaiting a Response Was Improper ..........................................................................................17

D. MetLife Initiates the Pilot Program in August 2016 to Find Missing Pension Risk Transfer Annuitants While Continuing to Improperly Release Reserves .....................................................................................................24

E. Defendants Admit that MetLife's Pension Risk Transfer Practice Was Improper and Caused MetLife's First Material Weakness in Internal Controls .......................................................................................................26

F. As the Fallout Continues After the Class Period, Defendants Kandarian and Hele, and Lenna, Are Held "Accountable," and MetLife Enters into the Consent Order with Massachusetts and Pays a $1 Million Fine ......................32

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .........................................................44

**Page**


A. Defendants' Financial Reporting During the Class Period Was Materially False and Misleading ....44

B. Defendants' Internal Control Statements and SOX Certifications Made During the Class Period Were Materially False and Misleading....49

C. Defendants' Accounting Reserves Statements During the Class Period Omitted Material Information....56

D. Defendants' Statements About the Company's Pension Risk Transfer Obligations Omitted Material Information....59

E. Defendants' Statements About the 2012 Settlement Agreement Omitted Material Information....62

F. Omissions Based on Violations of Item 303 of SEC Regulation S-K [17 C.F.R. §229.303]....64

ADDITIONAL SCIENTER ALLEGATIONS....66

LOSS CAUSATION/ECONOMIC LOSS....68

CLASS ACTION ALLEGATIONS....69

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS....71

NO SAFE HARBOR....73

COUNT I....73

For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants....73

COUNT II....74

For Violations of §20(a) of the Exchange Act Against the Individual Defendants....74

PRAYER FOR RELIEF....75

JURY DEMAND....75

Lead Plaintiffs KBC Asset Management NV ("KBC") and Labourers' Pension Fund of Central and Eastern Canada ("Labourers' Pension Fund," and with KBC, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by their undersigned attorneys, which included, among other things, the review and analysis of: (i) Securities Exchange Commission ("SEC") filings made by MetLife, Inc. ("MetLife"); (ii) documents publicly filed in *City of Westland Police and Fire Retirement System v. MetLife, Inc., et al.*, No. 1:12-cv-00256-LAK-AJP (S.D.N.Y.) (the "2012 Litigation"); (iii) the allegations contained in pleadings filed in *Roycroft v. MetLife, Inc., et al.*, No. 1:18-cv-05481-AKH-BCM (S.D.N.Y.) (the "2018 Litigation"); (iv) the allegations contained in pleadings filed in *In the Matter of MetLife, Inc.*, Docket No. E-2017-0119 (Mass. Securities Div., June 25, 2018) (the "Massachusetts Litigation") and the consent order in the Massachusetts Litigation dated December 18, 2018 (the "Consent Order"); (v) documents and information relating to the regulatory settlement agreement entered into by MetLife and several state insurance regulators on April 19, 2012 (the "2012 Settlement Agreement"); (vi) press releases, public statements, and other publications disseminated by, or concerning, Defendants (defined below); (vii) transcripts of investor conference calls with MetLife senior management; (viii) information posted on MetLife's corporate website; (ix) securities analyst reports concerning MetLife; and (x) news articles and media coverage concerning the events forming the basis of this complaint.

The investigation of Lead Plaintiffs' attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is a federal securities class action on behalf of all purchasers of the common stock of MetLife between February 27, 2013 and January 29, 2018, inclusive (the "Class Period"), seeking to pursue remedies against MetLife and certain of its current and former executive officers and/or directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2. MetLife is one of the world's leading financial services companies, providing its clients with insurance, annuities, employee benefits and asset management products and services. As of 2016, MetLife's U.S. operations have been organized into three businesses, including Retirement and Income Solutions ("RIS"), the line of business at issue in this case (as well as the predecessor business unit to RIS, Corporate Benefit Funding ("CBF")). Among the major products sold by MetLife's RIS line of business are so-called "pension risk transfers," whereby corporations manage pension risk via the transfer of their pension liabilities to professional insurance risk managers, such as MetLife. Pension risk transfers have become a major product line of MetLife as more companies strive to reduce their pension exposure, improve their bottom lines, and focus more on managing their business enterprises.

3. When a pension risk transfer agreement is entered into, MetLife establishes a liability, *i.e.*, an accounting reserve, to account for the future policy benefits that are to be paid to pension annuitants. Thereafter, MetLife reduces this liability, which is also referred to as releasing its accounting reserves, when it determines that a pension risk transfer annuitant has died, thereby terminating the Company's obligation to pay additional pension benefits to this person. MetLife's earnings increase commensurate with the reduction in its future pension benefits liability.

4. MetLife maintains more than $38 billion in pension risk transfer liabilities. As Daniel (defined below), the head of MetLife's pension risk transfer business during the Class Period stated in 2014, this business is a "core element" of MetLife's overall business.

5. This class action stems from Defendants' materially false and misleading statements and omissions concerning MetLife's improper release of accounting reserves for pension risk transfer annuitants whom the Company unreasonably deemed to be deceased, which the Company now admits was an inappropriate practice at all relevant times. Indeed, at the end of the Class Period, in the 12/15/2017 Form 8-K (defined below) and in the 1/29/2018 Press Release (defined below), Defendants admitted that the Company had, for years, summarily declared thousands of pensioners deceased, when in fact it was very easy to ascertain that they were alive, allowing the Company to improperly recognize over $500 million as profits.

6. This fraudulent scheme was accomplished through what Defendants knew, or recklessly disregarded, was a flawed and antiquated practice of sending pension risk transfer annuitants two form letters, five years apart, and declaring those who failed to respond as presumed dead, meaning that the Company could release the reserves held for them. No confirming telephone call, electronic mail, certified mail, inquiry to the employer pension plan for updated addresses for the missing annuitants, and/or electronic database search, such as the SSA-DMF (defined below), the government's death database, or LexisNexis, was required.

7. Defendants knew, or recklessly disregarded, that this practice was improper at all relevant times during the Class Period for the following reasons, among other things:

- *First*, the 2012 Settlement Agreement between MetLife and various state regulators required the Company to enhance its practice of sending only two letters to locate annuitants and taking no further steps when no responses were received. Pension risk transfer annuitants, however, were explicitly excluded from the 2012 Settlement Agreement. This means that MetLife was updating its contact practices for some annuity products, while leaving the antiquated contact practice for pension risk

transfer annuitants intact, conveniently allowing the Company to continue to improperly release reserves for annuitants who were alive;

- *Second*, a senior MetLife executive testified before Florida's state regulator in 2011 and admitted that the Company used the SSA-DMF once a month to see if group annuitants, which include pension risk transfer annuitants, were deceased in order to stop making payments to them. This means that MetLife could have, but chose not to, use the SSA-DMF to ensure that "deceased" pension risk transfer annuitants – whose names would not have appeared in the monthly SSA-DMF searches being run by MetLife – were actually deceased;

- *Third*, this MetLife executive also testified that annuitant deaths were supposed to be confirmed with family members before reserves were released. Defendants never did this for pension risk transfer annuitants during the Class Period. Instead, Defendants presumed their deaths if there were no responses to the two form letters that MetLife sent; and

- *Finally*, knowing that the Department of Labor ("DOL") was investigating the issue of missing annuitants, MetLife instituted the Pilot Program (defined below) in August 2016, which was not disclosed to investors. The Pilot Program confirmed that the Company's practice for locating pension risk transfer annuitants was improper years before investors were informed. Even worse, Defendants continued to improperly release reserves for "deceased" pension risk transfer annuitants the entire time that the Pilot Program was underway at MetLife.

8. Indeed, as Defendants admitted in the 12/15/2017 Form 8-K, the Company's practice of sending two form letters and then presuming death if no response was received from pension risk transfer annuitants was improper – and had been at all relevant times. In addition, Defendants disclosed in the 12/15/2017 Form 8-K that the Company's use of this practice could require a material increase in MetLife's reserves for its pension risk transfer liabilities.

9. Shortly thereafter, in the 1/29/2018 Press Release, the Company admitted to investors that this improper practice had, among other things: (i) caused the Company to issue financial statements in violation of GAAP (defined below) during the Class Period; (ii) led to the first material weakness in internal control over financial reporting at MetLife since the Sarbanes-Oxley Act of 2002 ("SOX") became effective in 2006; and (iii) allowed the Company to understate its accounting

reserves before and during the Class Period by $510 million, thereby necessitating a charge against earnings to increase accounting reserves related to pension risk transfers in that amount.

10. The Company's admission that this practice was improper before and during the Class Period also meant that Defendants' statements concerning MetLife's pension risk transfer obligations, MetLife's remediation efforts pursuant to the 2012 Settlement Agreement, and MetLife's compliance with applicable SEC regulations were also materially false and misleading.

11. Defendant Kandarian (defined below), MetLife's Chief Executive Officer ("CEO") during the Class Period, stated that the individuals who were responsible for allowing this practice to proliferate would be held "accountable." True to his word, shortly after the 1/29/2018 Press Release was issued, the Company announced that defendant Hele (defined below), MetLife's Chief Financial Officer ("CFO") during the Class Period, and Lenna (defined below), head of RIS, had "retired." In addition, the Company cut the pay of both defendants Kandarian and Hele.

12. Likewise, the Company has been sued in numerous lawsuits in light of these revelations, including the Massachusetts Litigation and the 2018 Litigation, and several regulators, including the SEC, have made inquiries to the Company about this matter. Indeed, just one day after Lead Plaintiffs filed their Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 71) ("AC"), it was publicly announced that the Massachusetts Litigation had ended with MetLife's entry into the Consent Order, which, among other things, caused the Company to: (i) pay a $1 million administrative fine; (ii) receive a public censure from the Massachusetts Securities Division; and (iii) agree to implement numerous reforms to MetLife's practice for locating missing pension risk transfer annuitants – changes that closely resemble those the Company agreed to in the 2012 Settlement Agreement, *i.e.*, before the Class Period, for locating other annuitants.

13. The revelations in the 12/15/2017 Form 8-K and 1/29/2018 Press Release, information which was never previously provided to investors during the Class Period, caused MetLife's stock to drop precipitously on both occasions, collectively erasing over $5 billion in market capitalization.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

17. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

### A. Lead Plaintiffs

18. On September 12, 2018, this Court appointed KBC and Labourers' Pension Fund to serve as Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). ECF No. 64.

19. KBC is an institutional investment company that provides financial and investment services. As part of KBC's asset management services, it is responsible for managing mutual funds, private funds, and institutional funds. KBC has nearly €300 billion in assets under management and 11 million clients. During the Class Period, as set forth in its certification previously filed with the

Court (ECF No. 27-1), which is incorporated by reference herein, KBC's funds purchased shares of MetLife common stock and suffered damages as a result of the securities law violations alleged herein.

20. Labourers' Pension Fund is a multi-employer pension plan providing benefits for employees working in the construction industry. Labourers' Pension Fund has over $7 billion in assets, and more than 114,000 active members and more than 21,000 retired members and beneficiaries. During the Class Period, as set forth in its certification previously filed with the Court (ECF No. 13-2), which is incorporated by reference herein, Labourers' Pension Fund purchased shares of MetLife common stock and suffered damages as a result of the securities law violations alleged herein.

**B. Defendants**

**a. The Company**

21. Defendant MetLife is a financial services company that provides insurance, annuities, employee benefits, and asset management in the United States and internationally. The Company is incorporated in the state of Delaware and maintains its principal executive offices at 200 Park Avenue, New York, New York, 10166. MetLife's common shares are traded on the NYSE under the symbol "MET." According to MetLife's Form 10-Q for the period ended September 30, 2018, which was filed on November 8, 2018 (the "3Q18 Form 10-Q"), the Company had 986,838,252 shares of common stock outstanding as of October 31, 2018.

**b. Defendant Kandarian**

22. Defendant Steven A. Kandarian ("Kandarian") has served as the President and CEO of MetLife since May 1, 2011, and has served as Chairman of the Company's Board of Directors (the "Board") since January 1, 2012. Immediately before being named as the Company's CEO,

defendant Kandarian worked at MetLife as Executive Vice President ("EVP") and Chief Investment Officer beginning in April 2005.

23. Defendant Kandarian understands the importance of pension plans making timely and uninterrupted payments of benefits. Indeed, immediately before working for MetLife, he served as the executive director of the Pension Benefit Guaranty Corporation ("PBGC") from 2001 to 2004. The PBGC is a federally chartered corporation created by the Employee Retirement Income Security Act of 1974 that protects the retirement incomes of nearly 37 million American workers, retirees and their families in private-sector defined benefit pension plans. The executive director of the PBGC reports to, among others, the Chairman of the DOL. As the PBGC's executive director, defendant Kandarian led the PBGC in fulfilling its core strategic goal – paying pension benefits on time and accurately.

24. Defendant Kandarian signed each of the Company's Forms 10-K and Forms 10-Q filed during the Class Period and certified them pursuant to SOX.

25. Defendant Kandarian is a defendant in the 2012 Litigation.

**c. Defendant Hele**

26. Defendant John C. R. Hele ("Hele") formerly served as EVP and CFO of MetLife from September 2012 until May 1, 2018. In his capacity as CFO, defendant Hele was responsible for overseeing all financial management matters for the Company, including ensuring accurate financial reporting, ensuring effective internal controls, and ensuring adequate reserves. During the Class Period, defendant Hele reported to defendant Kandarian and was a member of MetLife's executive group, which consisted of the top executives at MetLife.

27. In light of the significant fallout from the material weaknesses in internal controls caused by the Company's improper pension risk transfer practice, on May 1, 2018, defendant Hele abruptly and unexpectedly "retired" as CFO. Media coverage of the event described defendant

Hele's departure in less sanitized terms, and the market generally understood that defendant Hele was leaving MetLife for allowing the first-ever material weaknesses in internal controls that the Company has admitted to since SOX became effective in 2006.

28. Defendant Hele signed each of the Company's Forms 10-K and Forms 10-Q filed during the Class Period and certified them pursuant to SOX.

**d. Defendant Wheeler**

29. Defendant William J. Wheeler ("Wheeler") formerly served as President of the Company's Americas division, which encompassed MetLife's U.S. business, from November 2011 until August 2015. Defendant Wheeler "retired" from MetLife at age 53 in August 2015 and left the Company at that time. The market was surprised by defendant Wheeler's retirement because he was widely viewed as the Company's eventual replacement for defendant Kandarian.

30. This "retirement" proved to be short-lived, as defendant Wheeler was hired by a competitor of MetLife, Athene Holding Ltd. ("Athene"), to serve as its President in September 2015, a position he continues to hold today. Shortly after defendant Wheeler joined Athene, in 2016, Athene entered into the pension risk transfer business for the first time in its history. By the end of the Class Period, in just two years, Athene had established itself as the fourth largest player in the pension risk transfer business.

31. During his time as President of MetLife's Americas division, defendant Wheeler oversaw the Company's CBF business, which was run by Lenna, and the Company's Group Benefits business, which was run by Katz (defined below).

32. Before serving as President of MetLife's Americas division, defendant Wheeler served as MetLife's EVP and CFO beginning in 2005 until November 2011. In his capacity as CFO, defendant Wheeler was responsible for overseeing all financial management matters for the Company, including ensuring accurate financial reporting, ensuring effective internal controls, and

ensuring adequate reserves. From 2005 until his departure in 2015, defendant Wheeler was a member of MetLife's executive group, and he reported to defendant Kandarian.

33. Defendant Wheeler is a defendant in the 2012 Litigation.

34. Defendants Kandarian, Hele, and Wheeler are collectively referred to herein as the "Individual Defendants."

35. Defendant MetLife and the Individual Defendants are collectively referred to herein as the "Defendants."

36. Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business and operations, as detailed herein, via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. They also had the ability, and exercised the ability, to control the nature and content of information that the Company disseminated.

37. It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are attributable to them. By virtue of their high-level positions with the Company, the Individual Defendants participated in the management of the Company, were involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company. As detailed herein, they were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws.

38. As officers and controlling persons of a publicly held company whose common stock was traded on the NYSE, governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information on the Company's business, operations and prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. As alleged herein, Defendants did not discharge this duty.

## SUBSTANTIVE ALLEGATIONS

### A. Pension Risk Transfers Are a Core Element of MetLife's Business

39. MetLife is a global provider of insurance, annuities, employee benefits, and asset management. Before and during the Class Period, MetLife sold pension risk transfers, also known as pension closeouts, representing billions of dollars of pension benefits. Pension risk transfers have been a part of MetLife's business since 1921, when the Company issued its first group annuity contract to fund a defined benefit plan.

40. MetLife's pension risk transfers allow employers with traditional employee pension plans to purchase a group annuity contract from MetLife. In return, MetLife assumes responsibility for all (or a portion) of the employers' pension plan obligations, including asset management, locating annuitants, and payouts. Essentially, the pension risk transfer results in employers closing out their pension liabilities, and plan beneficiaries becoming entitled to annuity payments pursuant to MetLife group annuity contracts once they reach retirement age.

41. As part of the pension risk transfer, MetLife is also responsible for maintaining adequate reserves to account for the future policy benefits to be paid to the annuitants of group annuity contracts (the former pensioners). When an annuitant dies, MetLife no longer has to maintain reserves for that person and can release that portion of the reserves that had been set aside

to fund the future benefits payable to that person. As a result, an annuitant's death results in an increase to MetLife's earnings.

42. From the beginning of the Class Period until October 5, 2016, when MetLife underwent a corporate reorganization, pension risk transfers were part of MetLife's CBF business. Following the reorganization, pension risk transfers became part of a new business, RIS.

43. At all relevant times during the Class Period, MetLife Executive Vice President Robin Lenna ("Lenna") oversaw the CBF business and then the RIS business. During the Class Period, Lenna reported to the head of MetLife's U.S. business. In addition, Lenna was authorized by the Company to comment publicly on MetLife's behalf with respect to its CBF and RIS businesses, including, for example, in July 28, 2017 and September 26, 2016 press releases issued by MetLife.

44. From November 2011 to April 2015, defendant Wheeler served as the head of MetLife's U.S. business. Following defendant Wheeler's departure, Maria Morris ("Morris") served as the interim head of MetLife's U.S. business until June 2017. Beginning in June 2017, Michel Khalaf ("Khalaf"), former head of MetLife's Middle East, Africa and South Asia business, was named the head of MetLife's U.S. business. Defendant Wheeler, and Morris and Khalaf, were all executive officers of MetLife during their respective tenures as head of MetLife's U.S. business, and all reported to defendant Kandarian. Khalaf was also an executive officer of MetLife and reported to defendant Kandarian in his prior role.

45. Beginning on March 25, 2014, Wayne Daniel ("Daniel") was appointed as MetLife's Vice President of U.S. Pensions, with responsibility for overseeing MetLife's pension risk transfer business. Beginning at that time, and through the end of the Class Period, Daniel reported to Lenna. In addition, Daniel was authorized by the Company to comment publicly on MetLife's behalf with respect to its pension risk transfer business, including, for example, in a June 21, 2016 MetLife press

release announcing a pension risk transfer between the Company and PPG Industries, Inc., which involved MetLife assuming $1.6 billion in pension obligations.

46. Pension risk transfers were important to MetLife's overall business during the Class Period. Indeed, when Daniel was interviewed in June 2014 by *PlanSponsor*, an industry magazine, he stated that "pension risk management – which includes both pension risk transfer and risk mitigation strategies – ***is a core element of MetLife's business*** and has been for over 90 years . . . ***MetLife has a 45% market share and is a leading pension risk transfer provider***."[1] Further, according to Lenna, MetLife was managing nearly $38 billion of transferred pension liabilities as of June 2016.

47. Defendants also recognized the importance of MetLife's pension risk transfers business during the Class Period. For example, during an investor conference call on September 6, 2017, defendant Hele stated that "the other business that gets a lot of attention is the pension risk transfer business . . . . We like that business, it's a solid business. . . . We've been selling roughly between $1.5 billion to $2 billion a year in that. And we appear – we would think we're kind of on track for that range for this year as well. So we like the business."

48. Likewise, defendant Kandarian stated during an investor conference call on February 13, 2014, that "[Pension risk transfers] is a sector that MetLife has been a major player in historically. ***We were the largest again last year in 2013 in terms of the pension closeout business***."

49. And defendant Wheeler echoed these sentiments during a separate investor conference call on February 13, 2014, stating that "We did I think $1.7 billion, $1.8 billion in pension closeouts in 2013. By the way, ***that made us the market share leader in 2013***. . . . We do

---

[1] All emphasis is added unless otherwise noted.

see this as an area of growth. And I think – in the US and I think that is going to continue for quite some time."

50. Analysts also viewed pension risk transfers as being critical to the Company. For example, according to Barclays analyst Jay Gelb's June 10, 2014, report on MetLife's then-CBF business, he stated, in pertinent part, as follows:

> Corporate Benefit Funding (18% of 2015E Earnings) − ***Upside from Pension Closeout Deals***
>
> Corporate Benefit Funding offers pension risk solutions, structured settlements, stable value and investment products. It also provides other benefit funding products for the investment management of defined benefit and defined contribution pension plans. This business has a large allocation of alternative invested assets, including limited partnership interests and real estate joint ventures, which can generate significant income in favorable markets.
>
> MET anticipates moderate operating earnings growth in the near-term and 3-5% growth in the long-term (***with significant upside from pension closeout deals***). The pension risk market should be robust even if there are no jumbo deals with each $1bn of pension closeout sales translating to approximately $10mn of annual operating earnings. Our understanding is MET prices pension closeout deals to achieve a 12%+ ROE based on assumed long-term investment return (contracts are approximately 30 years duration), and mortality assumptions (rate at which people die).

51. Likewise, according to J.P. Morgan analyst Jimmy Bhullar's November 10, 2017, report on a recent meeting he had with defendant Hele, "Management's tone was upbeat, and the meetings reinforced our positive long-term view of MetLife. . . . MetLife is especially optimistic about growth in the group insurance, ***pension risk transfer***, and third-party asset management businesses."

52. Accordingly, at all relevant times during the Class Period, matters related to MetLife's pension risk transfer business were material to the Company and its investors.

### B. MetLife Employed an Admittedly Improper Practice During the Class Period for Locating Pension Risk Transfer Annuitants

53. In the 1990s, MetLife began employing an improper practice for its pension risk transfer business that was designed to benefit the Company at the expense of the annuitants, *i.e.*, the pensioners whom MetLife assumed the responsibility for paying benefits to. Specifically, MetLife attempted to reach annuitants at two different times using form letters – once on their 65th birthday (MetLife's definition of normal retirement age) and once again when they reached 70.5 years (MetLife's required minimum distribution age) – to confirm that they were still alive and that benefits should begin to be paid to them.

54. If no responses to these letters were received, MetLife presumed that the annuitant was deceased. The Company made no other efforts to confirm that the annuitant was, in fact, deceased. This was a significant determination – doing so allowed MetLife to release the benefits associated with that annuitant from the Company's reserves, boosting MetLife's profits.

55. According to the Massachusetts Litigation, which was launched against MetLife in June 2018 by the Massachusetts Securities Division's Enforcement Section, the form letters used by MetLife were potentially confusing to annuitants because they did not make clear the connection between MetLife and the annuitants' former employer. In other words, annuitants were often unaware that their benefits were being paid by MetLife instead of by their former employer. This was significant because pension risk transfer annuitants are generally not notified when their benefits are transferred from their former employer to an insurance company. Thus, many annuitants may not have even understood why MetLife was contacting them in the first instance. This confusion is something Defendants could have easily remedied during the Class Period. They chose not to do so.

56. MetLife's improper pension risk transfer practice led to approximately 13,500 retirees, or around 2.25% of the 600,000 retirees whose pensions were managed by MetLife

during the Class Period, never receiving their pension benefits even though they were alive. Instead, these individuals were presumed by the Company to be dead, thereby allowing the Company to release their benefits from the pension reserve accounts in order to contribute to MetLife's earnings. On an aggregate basis, this amounted to an approximately $510 million overstatement of MetLife's profits.

57. The Company utilized this improper practice even though many mechanisms for improved contact efforts were readily available. These include using: (i) the Social Security Administration's Death Master File ("SSA-DMF"), which is a computer database file made available since 1980 that contains information on over 83 million deaths dating back to 1962, is organized by name, birthdate and Social Security number, and is available on the Internet; (ii) certified mail; (iii) electronic mail; (iv) telephone; (v) LexisNexis's database of over 78 billion public records; (vi) contacting employers to see if the pensioners' addresses had changed after the pension risk transfer took place; and (vii) contacting beneficiaries that are listed by the annuitants. While all of these methodologies existed during the Class Period, MetLife did not use any of them. Instead, Defendants purposefully, and recklessly, ignored them.

58. After the Class Period, Defendants admitted that their Class Period practice for locating pension risk transfer annuitants was improper. Specifically, defendant Kandarian admitted during an investor conference call on February 14, 2018, that "the process we had in place" for locating these annuitants during the Class Period "was an error." Likewise, defendant Hele admitted during the same investor conference call that MetLife's practice was improper and ignored available mechanisms for contacting annuitants, such as "earlier, more frequent and simpler communication to annuitants as well as the use of certified mail, additional external databases and more locator

services, among other things." Defendant Hele also disclosed that these protocols would now be implemented by the Company going forward.

59. Accordingly, Defendants have admitted that the Company's practice for locating pension risk transfer annuitants, and the related releasing of reserves for annuitants who were presumed dead even though they were alive, was improper at all relevant times.

**C. The 2012 Settlement Agreement Demonstrates that Defendants Knew, or Recklessly Disregarded, that Their Practice of Confirming Annuitants' Living Status Through Mailing Two Form Letters and Awaiting a Response Was Improper**

60. The events leading to this litigation are not the first recent instance in which MetLife failed to adequately search for and compensate annuitants in order to benefit the Company at the expense of its customers. Beginning in September 2009, insurance regulators from the states of Florida and Illinois undertook a Joint Market Conduct Examination of the Company's use of the SSA-DMF regarding the Company's efforts to locate the owners and beneficiaries of life insurance and annuity products. Insurance regulators from California, Pennsylvania, New Hampshire, and North Dakota subsequently joined this effort (the "Multi-State Investigation").

61. The Multi-State Investigation focused on whether MetLife had violated various laws by using the SSA-DMF to benefit the Company while purposely not using the SSA-DMF in instances that would be to the Company's detriment. The Multi-State Investigation uncovered that MetLife was using the SSA-DMF to identify recently deceased annuitants whose benefits did not survive their death, thereby allowing MetLife to cease annuity payments and ensuring that the remainder of the annuity would contribute to MetLife's earnings. Conveniently, however, MetLife was not using the SSA-DMF to identify individuals who had annuity contracts with death benefits, or life insurance policies, but who never contacted MetLife upon the policyholder's death, meaning MetLife did not pay death benefits to their beneficiaries.

62. Shortly before the Class Period began, on April 19, 2012, MetLife entered into the 2012 Settlement Agreement with these six state insurance departments, agreeing to pay nearly $500 million, with $40 million to compensate the states for the cost of the Multi-State Investigation and the remainder to pay policyholders whose benefits were wrongly withheld. MetLife agreed to pay $188 million in 2012, with the remainder being paid out over the next 17 years. This means that MetLife was still making payments pursuant to the 2012 Settlement Agreement at all relevant times during the Class Period.

63. According to Florida's Insurance Commissioner at the time, Kevin McCarty ("McCarty"), the 2012 Settlement Agreement was "a landmark settlement, and it is probably the largest settlement in terms of return of money to consumers." Despite the significant penalty paid by MetLife (which the Company continues to pay), the Multi-State Investigation did not cause the Company to identify any material weaknesses in its internal controls.

64. The 2012 Settlement Agreement was signed on behalf of MetLife by Paul G. Cellupica ("Cellupica"), then-Chief Legal Counsel of MetLife's U.S. business (and currently Deputy Director of the SEC's Division of Investment Management). At the time that Cellupica signed the 2012 Settlement Agreement, defendant Kandarian was MetLife's CEO and defendant Wheeler was in charge of MetLife's U.S. business. This means that defendants Kandarian and Wheeler knew, or recklessly disregarded, the terms and circumstances surrounding MetLife's entry into the 2012 Settlement Agreement.

65. Apart from its financial terms, the 2012 Settlement Agreement also addressed MetLife's antiquated and ineffective practice of using two form letters to contact annuitants to confirm they were still living and then releasing their benefits from MetLife's reserves if no response was received. Specifically, MetLife agreed in the 2012 Settlement Agreement to change its practice

for locating annuitants, among other practices and procedures that the Company agreed to remediate, as follows: within 60 days of entering into the 2012 Settlement Agreement, if after MetLife sent annuitants or their beneficiaries two letters to notify them that their annuity payments were due to begin, and those letters received no response, the Company agreed to then conduct a "Thorough Search." The 2012 Settlement Agreement defines a "Thorough Search," which are the minimum efforts that MetLife must expend, as follows:

> i. The Company [must use] its best efforts to identify the Beneficiary and determine a current address for the Beneficiary based upon the Company's records, including but not limited to internal databases;
>
> ii. The Company [must make] two (2) attempts to contact the Beneficiary in writing at the address contained in Company's records or at the address determined in (i) above; provided that, if such writing is returned as undeliverable, the Company will not be required to send any additional mailings to that address ***and will within thirty (30) days update the address using online search or locator tools, including but not limited to the DMF Update File, Lexis Nexis, Accurint or other comparable databases***;
>
> iii. ***In the event that no response is received to the writings specified in (ii.) above, or a writing is returned as undeliverable and no updated address can be located, the Company [must attempt] to contact the Beneficiary by any telephone number contained in Company's records, including but not limited to its internal databases, provided that each attempted contact shall be logged***;
>
> iv. ***In the event that no response has been received to the attempted contacts described above, the Company shall attempt to contact the Beneficiary at the most current e-mail address, if any***;
>
> v. ***Send a third and final letter to the Beneficiary at the most current address available to the Company via certified mail***; provided, however, that, subject to contrary state law requirements, such letter may be sent by first class mail if, at some point prior to sending it, the Company has accessed a commercially available database service, which is used to update addresses in order to check for a more current address for the Beneficiary.

66. Effectively, MetLife's agreement to conduct a "Thorough Search" as part of the 2012 Settlement Agreement meant that the Company began using certified mail, electronic mail, the telephone, and online databases ***before the Class Period*** to contact annuitants.

67. But the Company did not do this for pension risk transfer annuitants. The reason why is because MetLife specifically excluded pension risk transfer annuitants from being covered by the changes agreed to in the 2012 Settlement Agreement. Specifically, the 2012 Settlement Agreement defined "Annuity Contract" as follows:

> a. "Annuity Contract" means a fixed or variable annuity contract ***other than a fixed or variable annuity contract issued to fund an employment-based retirement plan where MetLife is not committed by the terms of the annuity contract to pay death benefits to the beneficiaries of specific plan participants***. Nothing in this Agreement shall be construed as an admission of any party's position as to the preemptive effect of the Employee Retirement Income Security Act of 1974, as periodically amended, on state laws as applied to employment based plans.

68. In other words, as the Company was significantly enhancing its location practices for most annuitants, it purposely and knowingly failed to do the same for pension risk transfer annuitants. Instead, it left in place for pension risk transfer annuitants the very same two letter practice that the 2012 Settlement Agreement was designed to remediate and that Defendants knew, or recklessly disregarded, was inadequate.

69. By agreeing to enhance the Company's policies for contacting annuitants, but specifically excluding pension risk transfer annuitants, Defendants knew, or were reckless in not knowing, that the Company's practice for locating pension risk transfer annuitants was improper at all relevant times during the Class Period. Defendants' conduct is especially egregious because, unlike pension risk transfer annuitants who may not know that MetLife is responsible for paying them, the annuitants covered by the 2012 Settlement Agreement were not susceptible to such confusion because they had entered into annuities directly with MetLife.

70. Further, in connection with the Multi-State Investigation, Todd Katz ("Katz"), MetLife's Executive Vice President for Group Benefits, testified on May 19, 2011, before McCarty.

71. MetLife's Group Benefits business, known before MetLife's 2016 reorganization as the Group, Voluntary and Worksite Benefits business, was, along with CBF (and RIS after it), two of

the three component businesses of MetLife's U.S. business during the Class Period. Thus, both Lenna and Katz each reported to the head of MetLife's U.S. business during the Class Period as it was variously led by defendant Wheeler, and Morris and Khalaf. In addition, Katz periodically spoke on MetLife's behalf to investors during the Class Period, including, for example, at the Company's Investor Day presentation on June 10, 2014, where he spoke about MetLife's life insurance business along with defendant Wheeler. At the time of Katz's testimony, defendant Kandarian was MetLife's CEO and defendant Wheeler was MetLife's CFO, meaning they knew about, or recklessly disregarded, Katz's testimony.

72. Katz testified on May 19, 2011, that MetLife routinely used the SSA-DMF each month to identify deceased group annuitants so that the Company could stop making payments to these people. This means that, at all relevant times, MetLife was using the SSA-DMF to ascertain whether pension risk transfer annuitants had died so that they could stop paying benefits, but was not using the SSA-DMF to ensure that those annuitants who were presumed dead were actually deceased. Specifically, Katz testified, among other things, as follows:

> **Commissioner McCarty**: Okay. The we'll explore that with the different products. That would probably be great. ***Does MetLife use the Social Security Death Master File information for group annuities***?
>
> **Mr. Katz**: ***We do***. And I probably should talk a little bit about why we do and how that works, if that would be okay. For group annuity business, group annuities are typically claims that for the most part are in pay-off status; and so in a similar reason for using it as Social Security Administration has indicated, ***we use it as a means to prevent duration errors***. If you think about the death – the annuity business almost getting a regular check each month, ***and if we receive an indication of death, that an individual has an annuity, we will suspend that payment and write to the family to assure that the death occurred***. And I should clarify that. The rationale for that is if we didn't and continued with payments, by definition, if we were making payments to people who were dead, those would be duration errors, they would be inappropriate payments, and they also could put the beneficiary in a bad spot because they are getting money that actually isn't theirs.

**Commissioner McCarty**: Right. Understood. Without – I understand that's a large corporation and as you already specified. And just in general, how long has MetLife used the Death Master for group annuities?

**Mr. Katz**: To the best of my knowledge, ***we have been using it since the late '80s***.

**Commissioner McCarty**: Okay.

**Mr. Katz**: I can't give you an exact year.

**Commissioner McCarty**: That's fine. Does MetLife have written policies and procedures as it relates to the use of the Death Master File for group annuities?

**Mr. Katz**: I believe we do, ***yes***.

* * *

**Commissioner McCarty**: What is the match-up rate timeline [for the Death Master File] for today?

**Mr. Katz**: Currently, for group annuities, ***we are matching once a month***.

**Commissioner McCarty**: Once a month. Okay. What do you do when you get a match? I presume you would stop making the annuity payment.

**Mr. Katz**: ***For a group annuity, we consider a match an indication of death. We suspend the annuity payment. We write to the family indicating that we have done that***.

73. Katz's testimony establishes that, at all relevant times during the Class Period, the Company not only had access to the SSA-DMF, but was actively using it since the 1980s to ensure that MetLife was not paying group annuitants, which include pension risk transfer annuitants, after they died. MetLife, which had written policies and procedures for this practice, conducted these SSA-DMF match searches once a month.

74. This means that, at all relevant times during the Class Period, MetLife was receiving a monthly report with the names of all pension risk transfer annuitants who died since the last report. This report did not have the names of the pension risk transfer annuitants who were improperly being presumed to have passed away simply because they did not respond to two form letters.

75. Indeed, despite the Company's prolific use of the SSA-DMF, Defendants ***never*** used the SSA-DMF to confirm that missing pension risk transfer annuitants – who are also group annuitants – had actually passed away. In other words, the Company could have easily used the SSA-DMF to confirm that pension risk transfer annuitants were actually deceased after receiving no response to the two form letters, but consciously and recklessly chose not to do this. Instead, the Company only used the SSA-DMF when it benefitted MetLife's interests.

76. In addition, Katz's testimony establishes that, in the event MetLife believed a group annuitant was deceased, the Company was supposed to contact the families of annuitants to ensure that the death had in fact occurred. As Defendants confirmed at the end of the Class Period, this never happened for pension risk transfer annuitants, who were instead presumed dead after two form letters were not responded to, with MetLife taking no other action.

77. Katz's testimony establishes that Defendants knew, or were reckless in not knowing, that the Company's practice for locating pension risk transfer annuitants was improper at all relevant times during the Class Period.

78. Certain events surrounding the Multi-State Investigation and the 2012 Settlement Agreement form part of the underlying factual events at issue in the 2012 Litigation, which is currently pending before the Honorable Lewis A. Kaplan in the United States District Court for the Southern District of New York.

79. Specifically, the 2012 Litigation involves a class of investors alleging Exchange Act claims against MetLife and defendant Wheeler (among others) for a putative class period of February 9, 2011 to October 6, 2011. During this time, defendant Wheeler served as the Company's CFO and was responsible for, among other things, ensuring that the Company's financial statements were prepared in accordance with GAAP and were accurate.

80. The 2012 Litigation also involves a class of investors alleging Securities Act of 1933 ("Securities Act") claims against MetLife and defendants Kandarian and Wheeler (among others) for a putative class period of February 2, 2010 to October 6, 2011. During this time, defendant Kandarian served variously as MetLife's Chief Investment Officer and as CEO.

81. Among other things, the 2012 Litigation alleges that MetLife's financial statements were materially false and misleading, that the Company made misstatements and omissions regarding MetLife's reserve setting practices, and that certain MetLife SEC filings violated Item 303 of SEC Regulation S-K, among other SEC regulations.

82. Currently, the 2012 Litigation is proceeding in fact discovery. In addition, a motion to certify the Exchange Act class is pending. The Securities Act class in the 2012 Litigation was certified by Judge Kaplan on September 22, 2017.

83. MetLife and defendants Kandarian and Wheeler's counsel in the 2012 Litigation are the same counsel that are representing Defendants in this action.

84. On September 25, 2018, MetLife and defendants Kandarian and Wheeler, among the other defendants in the 2012 Litigation, filed an answer to the operative complaint (the "2012 Answer"). In the 2012 Answer, MetLife and defendants Kandarian and Wheeler admit, among other things, that "MetLife has accessed the SSA-DMF for specific purposes since the 1980s" and that "Todd Katz . . . testified at a public hearing held on behalf of the Florida Office of Insurance Regulation and the National Association of Insurance Commissioners on May 19, 2011 pursuant to subpoena."

### D. MetLife Initiates the Pilot Program in August 2016 to Find Missing Pension Risk Transfer Annuitants While Continuing to Improperly Release Reserves

85. Although the 2012 Settlement Agreement and Katz's testimony establish Defendants' knowledge, or reckless disregard, that the Company's practice for locating pension risk transfer

annuitants and the associated releasing of reserves was improper, additional events during the Class Period further support Defendants' knowledge or reckless disregard.

86. Specifically, according to *The Wall Street Journal*, beginning in 2013, the DOL's office in Philadelphia began receiving questions from pensioners wondering why they were not receiving their pension benefits. By 2015, the DOL's Philadelphia office opened an investigation into the matter.

87. In light of the DOL's investigation, MetLife launched an internal pilot program in August 2016 to address this issue, which was never disclosed to investors during the Class Period (the "Pilot Program"). The Pilot Program involved using additional data sources to locate missing pension risk transfer annuitants beyond the Company's standard practice of sending two form letters and then presuming death when there was no response.

88. The number of pension risk transfer annuitants identified by the Pilot Program who were improperly presumed as deceased has not been disclosed by the Company. Nonetheless, at the end of the Class Period, *The Wall Street Journal* reported that the results of the Pilot Program contributed to the Company's decision to disclose in the 12/15/2017 Form 8-K that MetLife's pension risk transfer practice was improper and required remediation.

89. At all relevant times that the Pilot Program was underway at MetLife, the Company continued to improperly release reserves that had been held for pension risk transfer annuitants because these annuitants were being presumed as dead after not responding to two form letters.

90. The Pilot Program further establishes that Defendants knew, or were reckless in not knowing, that the Company's practice for locating pension risk transfer annuitants was improper at all relevant times during the Class Period.

91. Further, defendant Kandarian knew, or was reckless in not knowing, that the DOL investigation posed a significant risk to MetLife's business. As the former executive director of the PBGC, where he directly reported to the Chairman of the DOL, defendant Kandarian was aware, or should have been, of the importance of MetLife paying pension benefits on time and accurately. By allowing MetLife's pension risk transfer practice for locating annuitants to prevent the timely and accurate payment of pension benefits, defendant Kandarian acted recklessly during the Class Period.

### E. Defendants Admit that MetLife's Pension Risk Transfer Practice Was Improper and Caused MetLife's First Material Weakness in Internal Controls

92. Though a significant amount of time had passed since the Pilot Program was initiated, Defendants finally began revealing that MetLife's pension risk transfer practice during the Class Period was improper and had exposed the Company, and its investors, to significant liabilities.

93. Specifically, on December 15, 2017, after the close of trading for the day, MetLife shocked investors when, buried at the end of a press release issued on Form 8-K (the "12/15/2017 Form 8-K") that provided "near-term guidance," the Company disclosed, for the first time, as follows:

> Further, MetLife has been in the retirement business for many decades. ***As practices have evolved, we are improving the process used to locate a small subset of our total group annuitant population of approximately 600,000 that have moved jobs, relocated, or otherwise can no longer be reached via the information provided for them. We currently believe the portion of the subset that is most impacted is less than 5% of our total group annuitant population and they tend to be smaller size cases with average benefits of less than $150 per month***.
>
> ***We are making our process more robust to include a wider set of search techniques and better utilize available technology. Taking these actions would result in strengthening reserves, which in the period recorded may be material to our results of operations and is not reflected in the outlook presented herein. We do not have an estimate at this point but we plan to provide further disclosure on our fourth quarter earnings call and in our annual report on Form 10-K for the year ended December 31, 2017***.

94. During an investor conference call that followed the release of the 12/15/2017 Form 8-K, defendant Hele provided further insight into the scope of this issue by acknowledging that MetLife's reserves were required to be increased by a material amount, commenting, in pertinent part, as follows:

> Before I close, let me comment on our enhanced search and outreach techniques for group annuitants. ***Taking these actions would result in strengthening reserves, which in the period recorded may be material to our results of operations and is not reflected in the outlook presented today***. We don't have an estimate at this point, but we plan to provide further disclosure on our first quarter earnings call and in our 2017 Form 10-K.
>
> As Michel mentioned, this involves group annuitants that we've sought to locate over time unsuccessfully. ***We are developing a process that utilizes enhanced outreach techniques, including greater use of technology***. Based on what we currently know, this involves a small subset of our group annuitant population of approximately 600,000. It represents group annuitants that have moved to jobs, relocated or otherwise could not be located. These tend to be smaller-sized cases with average benefits of less than $150 per month. While this work is underway, we are committed to achieving the targets and capital plans outlined on this call. Based on what we currently know, this will not impact our buyback plans in 2018.

95. That same day, *The Wall Street Journal* published an article focused on MetLife's failure to pay monthly pension benefits, highlighting that this wrongdoing had been ongoing for a long time and noting its similarity to the practices that were remediated by the 2012 Settlement Agreement. The article stated, in pertinent part, as follows:

> ***MetLife Inc. said it had failed to pay monthly pension benefits to possibly tens of thousands of workers in accounts that it has on its books as part of its large retirement business***.
>
> The New York insurer said it is seeking to find the retirees who are owed money and who generally have average benefits of less than $150 a month. It said it believes the group represents less than 5% of about 600,000 people who receive certain benefits from the firm.
>
> ***The discovery of the overdue money and the process of locating the missing people to pay them would require strengthening reserves, MetLife said in a filing. The company also said the amount "may be material to our results of operations***."

> The workers affected by Friday's disclosure were likely owed a defined amount of monthly income when MetLife took on responsibility for the pensions from their employers, under a booming business known as pension risk transfer. MetLife didn't say in what years it had acquired these particular pension plans, how many different plans the people were involved in, and how many years of missing income was owed.
>
> ***Some Wall Street analysts assumed that the payments could be 10 or more years overdue. At $150 a month for 30,000 people—5% of the 600,000—over 10 years, that could be up to $540 million***.
>
> * * *
>
> ***The company's disclosure recalls a scandal that played out across a large part of the life-insurance industry in recent years when state insurance regulators identified that there were billions of dollars of overdue life-insurance policies on insurers' books***.
>
> In 2012, MetLife agreed to pay $40 million to settle a multistate probe of its handling of death benefits, in a deal that was expected to pay more than $400 million to heirs of life-insurance policyholders.

96. Analysts were alarmed by the Company's disclosure. For example, on December 15, 2017, Wells Fargo analyst Sean Dargan issued a report on MetLife, which stated, in pertinent part, that "MET's share price today (-1.9% vs. S&P 500 +0.90%) is a reaction to disappointment with . . . . a potential reserve charge in 4Q17 in Retirement and Income Solutions (RIS), in our view."

97. Likewise, also on December 15, 2017, Barclays analyst Jay Gelb issued a report on MetLife, which stated, in pertinent part, that "Separately, MET unexpectedly announced it would likely take a 4Q17 charge related to its Group Annuity business (size not quantified, but we assume up to $1bn pre-tax)."

98. In response to the aftermarket revelations on December 15, 2017, the trading price of MetLife's common stock declined from a close of $51.41 on Friday, December 15, to a close of $50.79 on Tuesday, December 18 – a decline of $0.62, or 1.2%.

99. On December 18, 2017, the Company provided an emailed statement to *Pensions & Investments*, a money management industry newspaper, to provide further insight into the revelations in the 12/15/2017 Form 8-K. As reported in the *Pensions & Investments* article, MetLife stated, in pertinent part, as follows:

> "While it is still difficult to track everyone down, ***we have not been as aggressive as we could have been***," the company said in a statement. "When we realized this was a significant issue, we launched an effort to do three things: figure out what happened, strengthen our processes so that we do a better job locating retirees, and promptly pay anyone we find – as we always do. We are implementing enhanced techniques within MetLife's retirement and income solutions business to better locate and promptly pay any group annuitant who may be entitled to benefits."
>
> "***We are deeply disappointed that we fell short of our own high standards***. Our customers deserve better. We are committed to making this right for our customers. We found the issue, we self-reported it and we are committed to doing better[.]"

100. The December 18 *Pensions & Investments* article further noted that William F. Galvin ("Galvin"), Secretary of the Commonwealth of Massachusetts, and the Chief of its Securities Division, announced that his office had begun an investigation into MetLife for not paying benefits to pension risk transfer annuitants.

101. Further, on December 21, 2017, *The Wall Street Journal* reported that the Company had hired Robinson McDonald & Canna LLP to investigate how and why MetLife's RIS business failed to search adequately for the possibly tens of thousands of people owed pension benefits. This article also stated that the comments made by MetLife in the Company's statement recited in the *Pensions & Investments* article came from defendant Kandarian.

102. Then, on January 29, 2018, after the close of trading for the day, MetLife again shocked investors when, in a press release that preannounced the Company's 4Q17 financial results (the "1/29/2018 Press Release"), MetLife disclosed, for the first time, that the Company had identified a material weakness in its internal controls related to the Company's inability to locate and pay pension risk transfer annuitants, that this issue was forcing the Company to make revisions to its

prior financial statements, and that the SEC and New York Department of Financial Services ("NYDFS") had made inquiries to the Company regarding this issue. The 1/29/2018 Press Release stated, in pertinent part, as follows:

> NEW YORK--(BUSINESS WIRE)--Jan. 29, 2018-- MetLife, Inc. (NYSE:MET) today announced it has postponed its earnings report and conference call related to its results for the fourth quarter and full year ended Dec. 31, 2017, which had previously been scheduled for Jan. 31, 2018, and Feb. 1, 2018, respectively. MetLife will now issue its fourth quarter and full year 2017 earnings report and its Fourth Quarter Financial Supplement on Tuesday, Feb. 13, 2018 after the market closes. The company will hold its earnings conference call and audio webcast on Wednesday, Feb. 14, 2018 from 8:00 to 9:00 a.m. (EST). MetLife expects to file its 2017 Form 10-K by March 1, 2018.
>
> On its Dec. 15, 2017, Investor Outlook Call, MetLife announced that it was undertaking a review of practices and procedures used to estimate its reserves related to certain Retirement and Income Solutions group annuitants who have been unresponsive or missing over time.
>
> ***Management of the company has determined the prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting. MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities***. The amount of the reserve increase is based in substantial part on actuarial, legal, statistical, and other assumptions. If actual facts and factors differ from those the company has assumed, the reserve the company has established could be adversely or positively affected.
>
> The total amount expected to impact fourth quarter 2017 net income is between $135 million and $165 million pre-tax, the majority of which represents a current period strengthening of reserves and will be reflected in Adjusted Earnings (formerly known as Operating Earnings)*. ***We expect the full year 2017 net income impact to be between $165 million and $195 million pre-tax. In addition, the company intends to make prior period revisions to reflect the balance of these adjustments in the appropriate historical periods. The company also expects to correct historical periods for unrelated errors in those periods, as required by accounting standards. Those errors were previously recorded in the periods in which the company identified them***.
>
> Revisions to prior periods will be included in MetLife's 2017 Form 10-K and Fourth Quarter Financial Supplement. These revisions will not constitute a restatement of previously issued financial statements. These pre-tax revisions will be taxed at the 35% U.S. tax rate in effect, and the impacts of the recently enacted U.S. tax reform legislation will be reflected in Corporate & Other in the fourth quarter of 2017.

> In connection with MetLife's review and enhancement of the processes and procedures relating to its Retirement and Income Solutions business in the United States, MetLife is currently reviewing its processes and procedures for identifying unresponsive and missing international group annuity annuitants and pension beneficiaries. In addition, MetLife recently initiated an ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers. MetLife is not currently aware of any material deficiencies in its identification of unresponsive or missing annuitants, policyholders or beneficiaries with respect to such products under review.
>
> ***MetLife had previously informed its primary state regulator, the New York Department of Financial Services, about this matter and is responding to questions from them and other state regulators. The U.S. Securities and Exchange Commission enforcement staff has also made an inquiry regarding this matter and MetLife is responding to its questions***. To date, MetLife is not aware of any intentional wrongdoing in connection with this matter.

103. Notably, the Company's disclosure of a material weakness in internal control over financial reporting was the ***first time*** that MetLife has admitted to ***any*** weakness in internal control since SOX became effective in 2006 and began requiring companies to certify that their CEO and CFO had designed processes to ensure accurate reporting of financial results in accordance with U.S. Generally Accepted Accounting Principles ("GAAP").

104. After the 1/29/2018 Press Release was issued, analysts expressed surprise and disappointment with these new announcements regarding the Company's improper pension risk transfer practice. For example, on January 29, 2018, Evercore ESI analyst Thomas Gallagher issued a report on MetLife that questioned whether these revelations would necessitate senior management departures, stating, in pertinent part, as follows:

> Our take on this is that MET probably released the reserves too quickly and needed more time to pass, and/or should have made more of a concerted effort to notify the beneficiaries before a reserve release would have been deemed appropriate. ***Because some of these contracts go back for decades, the charge includes prior period adjustments, with about $180m being attributed to 2017, and the remaining $370mm impact being spread among the 4 years prior***.

* * *

> We believe this news will add to the discontentment of MET's shareholder base. As a result, ***we think there will be greater investor pressure to consider management changes***, including external candidates.

105. In response to the aftermarket revelations on January 29, 2018, the trading price of MetLife's common stock declined from a close of $54.40 on January 29 to a close of $48.07 on January 31 – a decline of $6.33, or 11.6%.

### F. As the Fallout Continues After the Class Period, Defendants Kandarian and Hele, and Lenna, Are Held "Accountable," and MetLife Enters into the Consent Order with Massachusetts and Pays a $1 Million Fine

106. Defendants continued making additional revelations after the end of the Class Period. On February 13, 2018, MetLife issued a Form 8-K that provided a detailed update on the 1/29/2018 Press Release (the "2/13/2018 Form 8-K"). The 2/13/2018 Form 8-K reported that MetLife had not one, but two, material weaknesses in internal control that were caused by the Company's improper Class Period practice for locating pension risk transfer annuitants, stating, in pertinent part, as follows:

> Management's Annual Report on Internal Control Over Financial Reporting
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rule 13a-15(f). In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP").
>
> Management evaluated the design and operating effectiveness of the Company's internal control over financial reporting based on the criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("the COSO framework"). ***Solely because of the material weakness in internal control over financial reporting described below, in the opinion of management, MetLife, Inc. has not maintained effective internal control over financial reporting at December 31, 2017***.

> A material weakness (as defined in Rule 12b-2 under the Exchange Act) is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.
>
> Identification of the Material Weakness in Internal Controls over Financial Reporting
>
> Approximately 25 years ago, companies that are or have been MetLife, Inc. subsidiaries established a practice of releasing the full insurance liability after two attempts at contacting these annuitants, based on the presumption that these annuitants would never respond and had not become entitled to benefits based on certain contractual provisions. The number of impacted annuitants for whom the Company released the full insurance liability was no more than 1,000 in any one year, and over the entire period totaled approximately 13,500 as of December 31, 2017, which is approximately 2% of the total group annuitant population.
>
> Following a detailed review, ***management concluded that such administrative practices were not sufficient to allow for reserves to be released. In addition, management concluded that the reserve release process issues, to the extent identified earlier***, were not timely communicated or escalated throughout the Company, hindering the Company's ability to fully identify and address these issues in a timely manner.
>
> Management concluded its internal control over financial reporting as of December 31, 2017 was not effective based on the criteria established in the COSO framework. ***The Company has identified the following deficiencies in the principles associated with both the control activities and information and communication components of the COSO framework***:
>
> • Ineffective design and operating effectiveness of the controls related to processes and procedures for identifying unresponsive and missing group annuity annuitants and pension beneficiaries (***Control Activities***); and
>
> • Ineffective design and operating effectiveness of the controls intended to ensure timely communication and escalation of the issue throughout the Company. (***Information & Communication***).

107. The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") is a joint initiative of five private sector organizations, established in the United States, dedicated to providing thought leadership to executive management and governance entities on critical aspects of, among other things, internal control, fraud, and financial reporting. COSO is supported by five organizations, including the Institute of Management Accountants, the American

Accounting Association, the American Institute of Certified Public Accountants, the Institute of Internal Auditors, and the Financial Executives International.

108. As described in the Company's Class Period Forms 10-K, MetLife's independent auditors, Deloitte & Touche LLP, audited MetLife's management's assessment of internal control over financial reporting based on COSO's model for evaluating internal control (the "COSO Internal Control Framework"). This model has been adopted as the generally accepted framework for internal control and is widely recognized as the definitive standard against which organizations measure the effectiveness of their systems of internal control.

109. The COSO Internal Control Framework is designed to provide an effective framework for public companies to use to analyze the internal control systems implemented in these organizations. The five components of the COSO Internal Control Framework are as follows: (i) control activities; (ii) information and communication; (iii) control environment; (iv) risk assessment; and (v) monitoring.

110. According to COSO, in an effective internal control system, all five components of the COSO Internal Control Framework must be working in order for an entity to achieve its mission, strategies and related business objectives. As admitted in the 2/13/2018 Form 8-K, the Company had two categories of material weaknesses in internal control – control activities and information and communication – at all relevant times during the Class Period. This meant that MetLife's internal control systems were ineffective at all relevant times during the Class Period.

111. In addition, the 2/13/2018 Form 8-K detailed the remediation efforts that MetLife was engaged in to correct the two material weaknesses in internal control, stating, in pertinent part, that "[t]he Company's remediation of the identified material weakness and strengthening of its internal control environment will require a substantial effort throughout 2018" and that "[t]he Company is

making immediate changes to its administrative and accounting procedures and search practices to identify, contact, and record responses from 'unresponsive and missing' plan annuitants and to otherwise locate missing annuitants."

112. As detailed in the 2/13/2018 Form 8-K, these practices will include using many of the tools that MetLife was forced to implement before the Class Period as a result of the 2012 Settlement Agreement, including using more than just two form letters, simplifying and clarifying the language used in the letters, using certified mail, using external databases, using e-mail, using telephone numbers, contacting employers for updated addresses, and contacting contingency beneficiaries (if listed) to reach the annuitant.

113. That same day, *The Wall Street Journal* published an article that, among other things, explained that because MetLife had revised the number of impacted annuitants down to approximately 13,500 from approximately 30,000, this meant that approximately $38,000 per affected annuitant had been improperly released from MetLife's reserves and had been improperly added to MetLife's earnings.

114. In connection with the 2/13/2018 Form 8-K, on February 14, 2018, the Company held an investor conference call that focused on the fallout from MetLife's improper Class Period practice for locating pension risk transfer annuitants (the "2/14/2018 Conference Call"). During this conference call, among other things, defendant Kandarian highlighted that the Company was taking swift action to hold executives accountable, stating, in pertinent part, as follows:

> Most of my comment this morning will focus on the issue within our Retirement and Income Solutions business that caused us to delay earnings and take an after-tax charge of $331 million or $510 million pretax.
>
> Simply put, ***this is not our finest hour***. ***We had an operational failure that never should have happened and it is deeply embarrassing***. We are undertaking a thorough review of our practices, processes and people to understand where we fell short and how we can reset the bar at the high level people have come to expect from

us over our 150-year history. ***The Board of Directors is fully engaged on this issue as well***.

* * *

Recently, the Department of Labor has been urging companies that sponsor pension plans to do a better job of finding their own unresponsive and missing participants. ***A pilot program MetLife conducted in 2016 and 2017 confirmed that with better outreach, we could establish contact with more people***. In the 1990s, MetLife established a practice of releasing reserves when the company could not establish contact with an annuitant. In retrospect, ***based in the process we had in place, this was an error***.

* * *

As we noted publicly in December, we launched an assessment into what happened. Well, I can report that to date, MetLife has not found any evidence of intentional wrongdoing. ***I can also tell you that we are taking action to hold people accountable***. In addition, we have taken steps to strengthen our processes for finding unresponsive and missing annuitants. ***These include additional mailings, certified mailings, phone calls and the use of additional third-party firms specializing in locating missing participants***.

* * *

MetLife's core purpose is providing financial protection to our customers. ***Central to that purpose is the timely payment of benefits, which makes this issue especially distressing to me. I am deeply disappointed that we fell short of our own high standards***. Our customers deserve our best efforts to find and pay them. We will do better. While I wish this issue had been escalated earlier for remediation, MetLife discovered the issue itself, self-reported it to our primary regulator, publicly disclosed it and is taking all necessary steps to fix it.

I will now discuss some of the ramifications of the group annuity issue. As mentioned, we took a charge to restore reserves previously release as well as accrued interest. Most of the charge is associated with periods prior to 2017. Given the size and nature of the issue, management has identified a material weakness in internal control of our financial reporting. ***This deficiency is only related to group annuity reserves***.

The material weakness we identified had 2 components. First, we had a lack of adequate controls over the administrative and accounting practices that led to the release of the reserves. ***Historically, MetLife would try to reach annuitants twice, once when they approach the normal retirement age of 65 and a second time when they approach required minimum distribution age of 70.5. As noted, we improperly released reserves for those annuitants who were unresponsive after the second attempt***.

> The second component was failure to escalate sooner. The reserve release process issues were not communicated or escalated on a timely basis throughout MetLife, which hindered our ability to identify and address them. We are working hard to remediate the material weakness and expect to make progress in 2018. John Hele will discuss the material weakness further.
>
> * * *
>
> ***We are also cooperating with our regulators on this matter, including the New York Department of Financial Services as our primary insurance regulator as well as the Securities and Exchange Commission as our securities regulator*.**

115. Defendant Kandarian's promise during the 2/14/2018 Conference Call to hold executives "accountable" was quickly fulfilled. On February 26, 2018, *The Wall Street Journal* reported that Lenna, who headed the Company's RIS business at all relevant times during the Class Period, was "retiring" effective March 1, 2018. The article further noted that although the RIS business at MetLife was one of the Company's biggest contributors to profits in recent years, at more than $1 billion in 2017 on a pre-tax basis, the Company had no immediate successor for Lenna.

116. The market viewed Lenna's departure not as a "retirement," but as fallout from MetLife's improper practice for locating pension risk transfer annuitants. For example, according to a *Bloomberg* article dated February 26, 2018, entitled "MetLife Retirement Unit Head Lenna Leaving After Pension Mishap," Lenna's departure was linked to the Company's revelation that "it had lost track of some clients eligible to receive pensions."

117. But MetLife was not done yet. On April 26, 2018, the Company announced that it was cutting the pay of both defendants Kandarian and Hele as a result of the material weaknesses in internal controls caused by the Company's improper Class Period practice for locating pension risk transfer annuitants. Specifically, defendant Kandarian's compensation was cut 3.9%, down to $14.7 million, while defendant Hele's compensation was cut 6.4%, down to $5.3 million. Both defendants Kandarian and Hele received a 25% reduction in the cash portion of their incentive pay that accounted for the cuts to their overall compensation.

118. In cutting defendants Kandarian and Hele's pay, MetLife explained in an April 26, 2018 SEC filing on Form DEF 14A that it was due to the Company's first material weakness in internal control since SOX became effective, stating, in pertinent part, as follows:

> ***Mr. Hele's AVIP for 2017 performance and LTI granted in 2018 are less than for 2016 in consideration of the Company's performance in managing financial matters, including material weakness in internal control over financial reporting***.
>
> * * *
>
> ***Mr. Kandarian recommended, and the Committee approved, an AVIP award for 2017 that was down 25% from 2016 (decrease of $500,000). Mr. Hele's LTI granted in 2018 is also lower than for the past two years. In each case, these awards reflect the Company's performance in managing financial matters, including material weaknesses in internal control over financial reporting***.

119. Just days later, on May 1, 2018, MetLife announced that defendant Hele was "retiring" as the Company's CFO effective immediately, despite being only 59 years old.

120. The market did not buy the Company's attempt to sanitize the true reason for defendant Hele's departure. According to *Crain's New York Business*, "[defendant Hele] gets [the] heave-ho amid ongoing accounting woes." In addition, according to *The Financial Times*, "[defendant Hele] leaves after reserves debacle," and further commenting that his "departure comes after the insurer acknowledged that over a period of about 25 years, it failed to make hundreds of millions of dollars of pension payments to about 13,500 people."

121. Likewise, Barclays analyst Jay Gelb wrote in a May 1, 2018, report on MetLife, in pertinent part, that "We were not expecting this transition in the CFO role, although our sense was there has been investor frustration following various charges related to . . . pension risk transfer issues."

122. Also on April 26, 2018, defendant Kandarian issued his annual Chairman's letter to MetLife's shareholders and admitted that the problems with MetLife's improper practice for locating

pension risk transfer annuitants was one of the three biggest problems facing MetLife since 2011, stating, in pertinent part, as follows:

> Over the past seven years, MetLife has faced three main challenges it needed to overcome to create value for shareholders.
>
> * * *
>
> Our third – and current – challenge is operational. ***The issue in our group annuity business was an operational failure that never should have happened***. Nor was it the first negative surprise in recent years. Some of the company's challenges have their roots in business written decades ago, ***but others occurred on the watch of this management team***. Strengthening the company's ability to execute is critical if we are going to deliver better returns to shareholders. The Board of Directors shares this view and is actively involved in overseeing management's actions to improve operational performance.

123. Following the initiation of this action in February 2018, on June 25, 2018, MetLife was also sued by Galvin and the Massachusetts Securities Division's Enforcement Section in the Massachusetts Litigation for allegedly violating Mass. Gen. Laws ch. 110A, §101(2) ("Mass. Section 101"), which closely resembles SEC Rule 10b-5, but does not have an implied private right of action.

124. Specifically, the Massachusetts Litigation challenges some of the same statements concerning internal controls and accounting reserves from MetLife's Forms 10-K issued during the Class Period that are discussed in ¶¶156-79 below for violating Mass. Section 101.

125. The Massachusetts Litigation seeks, among other things, to impose an administrative fine on MetLife and to have MetLife censured. In addition, the Massachusetts Litigation seeks to require MetLife to locate all Massachusetts residents eligible for pension risk transfer benefits from MetLife, to notify such Massachusetts residents of the benefits they are owed, and to immediately pay these benefits to those Massachusetts residents, with interest. The Massachusetts Litigation does not purport to seek damages on behalf of MetLife's investors.

126. In a press release issued in connection with the announcement of the Massachusetts Litigation on June 25, 2018, Galvin commented about the ease with which his office was able to locate Massachusetts retirees whose pension benefits were improperly withheld by MetLife, stating, in pertinent part, as follows:

> ***The complaint filed by Galvin's office alleges that MetLife's public filings contained material misstatements about the company's finances resulting from the failure to adequately administer employer pension plans***. Under these pension plans, MetLife was responsible for reserving enough money to make payments to Massachusetts pensioners, whose average age was 72. Instead, some reserves were released and became assets which inflated MetLife's bottom line.
>
> The charges brought by Galvin's office are the result of an investigation opened by his Securities Division in December 2017, after MetLife announced that it had lost track of tens of thousands of pensioners to whom they owed payments. MetLife had acquired the pension obligations from the retirees' employers.
>
> "Once we were notified of these so-called missing pensioners, my first priority was to track down Massachusetts seniors who were owed back pension payments," Galvin said. "***My office was able to locate a majority of the missing Massachusetts residents within just a few weeks. In fact, approximately half of these seniors were still living at the same address MetLife had on file for them for the entire time MetLife failed to make payments to people they had so callously designated as 'presumed dead***.'"
>
> "The payments to individual retirees may seem small to MetLife, but for the retired nurses, salesmen, shipbuilders, grocery clerks, and other seniors affected who are living primarily on social security, these payments were significant," Galvin added.
>
> * * *
>
> "***MetLife has an obligation to provide truthful statements in its public filings. They did not," Galvin said. "Shareholders and investors were denied the ability to rely on MetLife's public statements. My action today is based on the misleading statements as to MetLife's financial condition***."

127. The Massachusetts Litigation highlights the harm that MetLife's Class Period failures to locate pension risk transfer annuitants had on retirees, discussing, for example, a Vietnam war veteran who retired from a shipyard in 1986 but did not begin receiving his benefits from MetLife until 2018.

128. On December 19, 2018, just one day after Lead Plaintiffs filed the AC, the Massachusetts Securities Division publicly announced that it had entered into the Consent Order with MetLife on December 18, 2018, thereby concluding the Massachusetts Litigation.

129. According to the Consent Order, MetLife violated Mass. Section 101 by utilizing an improper practice for locating pension risk transfer annuitants and releasing reserves for those annuitants after presuming they had died without having a reasonable basis for this determination.

130. By entering into the Consent Order, MetLife was publicly censured by the Massachusetts Securities Division and ordered to pay a $1 million administrative fine – among the higher end of fines leveled by the Massachusetts Securities Division.

131. In addition, the Consent Order requires MetLife to adopt many of the practices for locating missing annuitants that the Company was forced to adopt for other annuitants as part of the 2012 Settlement Agreement. This further supports Defendants' knowledge, or reckless disregard, of why it was improper for MetLife to exclude pension risk transfer annuitants from the enhanced location practices required by the 2012 Settlement Agreement.

132. Specifically, in order to ensure that MetLife locates missing pension risk transfer annuitants, the Consent Order requires MetLife to utilize certified mail, telephone calls, database searches for updated addresses, contacting employers for updated addresses, and contacting family members of the annuitant. Among other things, the Consent Order provides, in pertinent part, as follows:

> I. [MetLife] has and will continue to take reasonable steps to locate the Massachusetts Annuitant Population eligible for benefits pursuant to [MetLife] group annuity contracts, process all past due amounts plus any interest owed, and effect all continuing payments. ***The following shall constitute reasonable steps***:
>
> 1. Up to three (3) letters will be mailed to the most current address on file. ***The first mailing will be a certified letter***. The second and third letters will be sent by first class mail if [MetLife] does not receive a response to the first letter. If any of the letters are returned as undeliverable, a manual search for a more current address

> will be conducted. If an alternate address is found, a new certified letter will be mailed to the updated address and the letter count is reset. If no alternate address is found, the second and third letters will be mailed to the original address. ***The manual search will be through Accurint or one of*** [MetLife's] ***data vendors to obtain a better address***;
>
> 2. If still not located, [MetLife] will make best efforts to make up to ***three (3) outbound telephone calls*** on different days of the week and at different times of the day where a telephone number is available;
>
> 3. If still not located and [MetLife] has client contact information, [MetLife] will make reasonable efforts to attempt to ***reach the plan sponsor or company contact to request participant information***;
>
> 4. If still not located and contact information is available for a spouse or designated beneficiary, [MetLife] ***will attempt to contact the spouse and/or designated beneficiary***; and
>
> 5. [MetLife] shall provide a certification within one-hundred twenty (120) days of this Order of the remaining Massachusetts Annuitant Population deemed unresponsive, including the identity of the annuitant and all steps taken to contact the annuitant.
>
> * * *
>
> L. [MetLife] shall provide the Enforcement Section with any related additional information or documentation reasonably requested by the Enforcement Section for three-hundred sixty-five (365) days after this Order, such as documentation submitted by annuitants and documentation supporting [MetLife's] decision regarding the resolution process;
>
> M. [MetLife] shall, by March 31, 2019, provide to the Enforcement Section a copy of the formalized written policies and procedures designed to establish and maintain contact with annuitants whose benefits have not commenced. These policies and procedures may be updated on a going forward basis as necessary. Failure to comply with or modify the policies and procedures referenced in this paragraph only shall not constitute a failure to comply with terms of this Order;

133. In addition, MetLife has been sued in the 2018 Litigation by Edward Roycroft, a former employee of Martindale-Hubble, Inc., whose pension was part of a risk transfer between that company and MetLife. The 2018 Litigation seeks damages on behalf of a class of pension risk transfer annuitants who were due benefits from MetLife but did not receive them. MetLife's motion

to dismiss has been fully briefed and is pending before the Honorable Alvin K. Hellerstein in the United States District Court for the Southern District of New York.

134. According to the 3Q18 Form 10-Q, the Company's primary state regulator, the NYDFS, continues to examine the Company's practices in connection with paying pension benefit annuities. In addition, the Company disclosed that the Division of Enforcement of the SEC is also investigating these matters. Likewise, the Company disclosed that several additional unnamed regulators have made inquiries relating to these matters.

135. The 3Q18 Form 10-Q also explained that the Company has still not completed remediating the material weaknesses in internal controls disclosed in the 2/13/2018 Form 8-K. That these internal control deficiencies still require remediation many months after the Class Period ended demonstrates the extent to which MetLife's Class Period practice had damaged the Company's control over financial reporting.

136. Finally, while several of the Company's post-Class Period disclosures include self-serving claims that no fraud was committed in connection with the Company's improper practice for locating pension risk transfer annuitants, these cannot be credited for several reasons beyond the fact that no company would ever accuse itself of committing securities fraud, including, among other things:

- Defendants knew, or recklessly disregarded, that pension risk transfer annuitants were being searched for using an antiquated practice that was known to be inadequate in light of the 2012 Settlement Agreement;
- Defendants knew, or recklessly disregarded, that Katz's testimony meant the Company could have easily used the SSA-DMF to ensure that pension risk transfer annuitants were actually deceased, but MetLife chose not do so;
- the Company admitted to two material weaknesses in internal controls, which, by definition, create an environment in which securities fraud can readily occur;
- the Company took extreme measures after this improper practice was revealed, including cutting defendants Kandarian and Hele's pay and removing defendant Hele

and Lenna. These steps indicate that MetLife believed fraudulent activity had taken place in connection with this practice; and

- the Company was forced to enter into the Consent Order, thereby causing MetLife to pay a $1 million fine, receive a public censure, and agree to change MetLife's outreach practice for locating missing pension risk transfer annuitants to align with the enhanced practices agreed to by MetLife in the 2012 Settlement Agreement.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

137. The Class Period commences on February 27, 2013. During the Class Period, Defendants disseminated materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning: (i) MetLife's compliance with GAAP in its financial reporting and financial statements; (ii) the accuracy and completeness of the Company's Forms 10-K and 10-Q, filed during the Class Period, as represented in certifications pursuant to SOX; (iii) the adequacy of the Company's reserves to cover MetLife's liabilities to pay pension risk transfer annuitants; (iv) MetLife's obligation to locate and pay pension risk transfer annuitants; (v) MetLife's failure to update its policies for locating pension risk transfer annuitants in light of the 2012 Settlement Agreement; and (vi) known uncertainties and material risks associated with MetLife's operations.

**A. Defendants' Financial Reporting During the Class Period Was Materially False and Misleading**

138. Defendants have admitted that, before and during the Class Period, the Company issued to investors, and filed with the SEC, financial statements that violated GAAP and SEC regulations and were, therefore, materially false and misleading. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

139. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes

or other disclosures. 17 C.F.R. §210.4-01(a)(1). Regulation S-X provides that interim financial statements must also comply with GAAP. 17 C.F.R. §210.10-01(a).

140. In the 1/29/2018 Press Release, MetLife admitted that the financial statements it issued to investors during the Class Period violated GAAP and contained errors associated with accounting reserves for the Company's group annuity business, *i.e.*, pension risk transfer annuitants.

141. GAAP, in Accounting Standards Codification ("ASC") No. 944, Financial Services - Insurance, generally provides that a liability for future policy benefits is to be estimated based, in part, upon the present value of estimated future benefits to be paid. MetLife issued financial statements that violated this provision of GAAP and were materially misstated during the Class Period when MetLife improperly understated the present value of estimated future benefits to be paid on its pension risk transfer obligations.

142. As a result, MetLife has now amended the financial statements it issued to investors during the 2017, 2016 and 2015 fiscal years to correct such financial misstatements. Among other periods, MetLife has determined the misstatements to its group annuity accounting reserves caused the Company's:

- net income for the year ended December 31, 2016, to be overstated by approximately 3%;
- net loss during the quarter ended September 30, 2017, to be understated by approximately 10%; and
- net income for the quarter ended June 30, 2016, to be overstated by approximately 5%.

143. In addition, MetLife has admitted that the misstatements to its group annuity accounting reserves during the fiscal years before 2015, which includes the 2013 and 2014 fiscal years that are part of the Class Period, caused its net income to be overstated by approximately $200 million.

144. During the Class Period, MetLife's yearly and quarterly reports filed with the SEC characterized the Company's "liabilities for future policy benefits," which include the Company's accounting reserves for MetLife's pension risk transfer business, as being "critical" accounting estimates. These yearly and quarterly reports also explained that the Company's liabilities for future policy benefits are established using actuarial estimates of the amount of future pension benefits MetLife is obligated to pay pension risk transfer annuitants.

145. Given the "critical" nature of these accounting estimates, it was incumbent upon Defendants to ensure that its accounting reserves for pension risk transfer annuitants were accurately maintained. In fact, in 2002, the SEC issued the Financial Reporting Release No. 60, Cautionary Advice Regarding Disclosure About Critical Accounting Policies, urging public companies to pay "special attention" to their most critical accounting policies and cautioning managers of public companies to "bring particular focus to the evaluation of the critical accounting policies" and to make certain that they can "defend the quality and reasonableness of the most critical policies."

146. Despite the foregoing SEC requirements, critical accounting estimates associated with the Company's accounting reserves for pension risk transfer annuitants were prepared with such lack of care that they were misstated by over $500 million. Thereafter, MetLife repeatedly misrepresented, and defendants Kandarian and Hele repeatedly falsely certified, that the Company's internal controls were operating effectively when, in fact, MetLife's most critical accounting estimates operated with material weaknesses and ineffective controls, as Defendants have now admitted.

147. GAAP, in the SEC's Staff Accounting Bulletin No. 99, Materiality ("SAB No. 99"), provides that materiality in the context of financial information not only includes a quantitative assessment of the magnitude of a misstatement, but also requires a qualitative assessment of the

factual context in which the user of the false financial statements would view the financial information.

148. In addition, SAB No. 99 provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."

149. Likewise, GAAP, as articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M ("CSAB Topic 1M"), provides that materiality in the context of a financial misstatement not only includes an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial misstatement (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

150. For example, CSAB Topic 1M notes that even quantitatively small financial misstatements may be material if management has intentionally made adjustments to various financial statement items in a manner inconsistent with GAAP. Accordingly, CSAB Topic 1M cautions that SEC registrants "should not assume that even small intentional misstatements in financial statements" are immaterial.

151. Here, Defendants self-servingly characterize the Company's financial misstatements relating to MetLife's pension risk transfer business as being "immaterial," but admit that MetLife's financial statements were materially misstated in quantitative terms for the fiscal quarters ended June 30, 2016 and September 30, 2017 (*i.e.*, those financial statements contained in MetLife's August 5, 2016, and November 6, 2017, Forms 10-Q). Thus, MetLife has admitted that its financial statements for these two fiscal quarters were materially misstated.

152. The remaining Class Period fiscal years and quarters are also material given numerous qualitative factors that demonstrate the materiality of these financial misstatements. Indeed, it is inconceivable that a reasonable investor would consider financial misstatements in excess of one-half billion dollars to be immaterial when making an investment decision, especially given, among other things: (i) the importance of pension risk transfers to MetLife's U.S. business, as detailed in ¶¶39-52; (ii) the importance of MetLife's ability to timely locate and pay annuitants in the aftermath of the Multi-State Investigation and the 2012 Settlement Agreement, as detailed in ¶¶60-84; (iii) the Company's need to implement the Pilot Program to address its failure to accurately locate annuitants, as detailed in ¶¶85-91; (iv) that, as a result of this improper practice, MetLife experienced its first material weakness in internal control over financial reporting since SOX became effective in 2006, as detailed in ¶¶92-105; (v) that defendant Hele and Lenna were forced to depart the Company for overseeing this improper practice, as detailed in ¶¶106-36; and (vi) the significant negative market reaction to the revelations contained in the 12/15/2017 Form 8-K and the 1/29/2018 Press Release, which erased over $5 billion of MetLife's market capitalization, as detailed in ¶¶205-11.

153. Moreover, financial improprieties resulting in financial misstatements of such magnitude bear directly upon the integrity of MetLife's financial reporting and the risk premium investors assigned to MetLife's common stock, particularly when such misstatements were associated with improprieties related to the Company's most critical accounting estimates. The financial misstatements challenged herein were undoubtedly material to MetLife's investors.

154. Accordingly, the financial statements and related financial disclosures contained in the following yearly and quarterly reports that MetLife filed with the SEC during the Class Period were materially false and misleading:

| Date | Type | Description | Speaker(s) |
|---|---|---|---|
| February 27, 2013 | Form 10-K | Annual Report for FY12 | MetLife, Kandarian, Hele |
| May 7, 2013 | Form 10-Q | Quarterly Report for 1Q13 | MetLife, Kandarian, Hele |
| August 7, 2013 | Form 10-Q | Quarterly Report for 2Q13 | MetLife, Kandarian, Hele |
| November 7, 2013 | Form 10-Q | Quarterly Report for 3Q13 | MetLife, Kandarian, Hele |
| February 27, 2014 | Form 10-K | Annual Report for FY13 | MetLife, Kandarian, Hele |
| May 8, 2014 | Form 10-Q | Quarterly Report for 1Q14 | MetLife, Kandarian, Hele |
| August 8, 2014 | Form 10-Q | Quarterly Report for 2Q14 | MetLife, Kandarian, Hele |
| November 6, 2014 | Form 10-Q | Quarterly Report for 3Q14 | MetLife, Kandarian, Hele |
| February 27, 2015 | Form 10-K | Annual Report for FY14 | MetLife, Kandarian, Hele |
| May 8, 2015 | Form 10-Q | Quarterly Report for 1Q15 | MetLife, Kandarian, Hele |
| August 6, 2015 | Form 10-Q | Quarterly Report for 2Q15 | MetLife, Kandarian, Hele |
| November 5, 2015 | Form 10-Q | Quarterly Report for 3Q15 | MetLife, Kandarian, Hele |
| February 25, 2016 | Form 10-K | Annual Report for FY15 | MetLife, Kandarian, Hele |
| May 6, 2016 | Form 10-Q | Quarterly Report for 1Q16 | MetLife, Kandarian, Hele |
| August 5, 2016 | Form 10-Q | Quarterly Report for 2Q16 | MetLife, Kandarian, Hele |
| November 3, 2016 | Form 10-Q | Quarterly Report for 3Q16 | MetLife, Kandarian, Hele |
| March 1, 2017 | Form 10-K | Annual Report for FY16 | MetLife, Kandarian, Hele |
| May 5, 2017 | Form 10-Q | Quarterly Report for 1Q17 | MetLife, Kandarian, Hele |
| August 4, 2017 | Form 10-Q | Quarterly Report for 2Q17 | MetLife, Kandarian, Hele |
| November 6, 2017 | Form 10-Q | Quarterly Report for 3Q17 | MetLife, Kandarian, Hele |

155. The financial statements and related financial disclosures in the MetLife SEC filings listed in the chart in ¶154 were materially false and misleading when made because they misrepresented, or failed to disclose: (i) that MetLife's financial statements were presented in violation of GAAP; (ii) that MetLife's financial statements were materially misstated and should not have been relied upon because the Company's practice for locating pension risk transfer annuitants during the Class Period was improper; and (iii) that MetLife's financial statements were unreliable and materially misstated because the Company's internal controls over financial reporting contained material weaknesses.

**B. Defendants' Internal Control Statements and SOX Certifications Made During the Class Period Were Materially False and Misleading**

156. COSO defines internal control as a process, effected and supervised by a public corporation's board of directors and senior management, that is designed to provide reasonable assurance that, among other things, the corporation's financial statements are reliable and accurate

and that a company complies with applicable laws and regulations. As a result, the Individual Defendants and MetLife's senior management were responsible at all times during the Class Period for ensuring that MetLife had effective internal controls.

157. Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit [the] preparation of financial statements in conformity with [GAAP]." These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

158. Pursuant to Regulation S-K Item 308, Internal Control Over Financial Reporting, management is required to provide an annual report of the company's internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the Exchange Act) that contains:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant;

- A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §240.13a-15 or §240.15d-15 of this chapter;

- Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective – this discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management. Management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting; and

- A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on the registrant's internal control over financial reporting.

159. As MetLife acknowledged in each of the Company's Class Period Forms 10-K, "Management of MetLife, Inc. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting."

160. MetLife has now admitted that the Company's internal controls over financial reporting during the Class Period contained material weaknesses due to the Company's improper Class Period practice for locating pension risk transfer annuitants who were required to be paid benefits by MetLife. As defined in the Public Company Accounting Oversight Board Auditing Standard No. 5 §A7, a material weakness is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

161. The 1/29/2018 Press Release revealed that MetLife's Class Period financial statements and related financial disclosures in its yearly and quarterly SEC filings were false and misleading because of a material weakness in internal control, which is detailed in ¶102. The 2/13/2018 Form 8-K clarified that there were actually two material weaknesses in internal control caused by this improper practice, as detailed in ¶106.

162. These admissions establish that each yearly SEC filing made by MetLife during the Class Period contained the following false and misleading statements made by MetLife and defendants Kandarian and Hele:

Item 9A. Controls and Procedures

***Management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of***

> ***the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective***.
>
> There were no changes to the Company's internal control over financial reporting as defined in Exchange Act Rule 13a-15(f) during the quarter ended December 31, 2012 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.
>
> Management's Annual Report on Internal Control Over Financial Reporting
>
> Management of MetLife, Inc. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America.
>
> Management has documented and evaluated the effectiveness of the internal control of the Company at December 31, 2012 pertaining to financial reporting in accordance with the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***In the opinion of management, MetLife, Inc. maintained effective internal control over financial reporting at December 31, 2012***.

163. Although the quoted passage in ¶162 came from MetLife's Form 10-K filing for fiscal year 2012, dated February 27, 2013, MetLife and defendants Kandarian and Hele made the same false statements regarding MetLife's maintenance of effective internal controls over financial reporting in the following yearly SEC filings made during the Class Period:

| **Date** | **Type** | **Description** | **Speaker(s)** |
|---|---|---|---|
| February 27, 2013 | Form 10-K | Annual Report for FY12 | MetLife, Kandarian, Hele |
| February 27, 2014 | Form 10-K | Annual Report for FY13 | MetLife, Kandarian, Hele |
| February 27, 2015 | Form 10-K | Annual Report for FY14 | MetLife, Kandarian, Hele |
| February 25, 2016 | Form 10-K | Annual Report for FY15 | MetLife, Kandarian, Hele |
| March 1, 2017 | Form 10-K | Annual Report for FY16 | MetLife, Kandarian, Hele |

164. In addition, in each quarterly SEC filing made by MetLife during the Class Period, MetLife and defendants Kandarian and Hele again falsely and misleadingly represented that the Company had effective internal controls over financial reporting, stating, in pertinent part, that:

> Management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective***.
>
> ***There were no changes to the Company's internal control over financial reporting as defined in Exchange Act Rule 13a-15(f) during the quarter ended March 31, 2013*** that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

165. Although the quoted passage in ¶164 came from MetLife's Form 10-Q filing for the first quarter of fiscal year 2013, dated May 7, 2013, MetLife and defendants Kandarian and Hele made the same false statements regarding MetLife's maintenance of effective internal controls over financial reporting in the following quarterly SEC filings made during the Class Period:

| **Date** | **Type** | **Description** | **Speaker(s)** |
|---|---|---|---|
| May 7, 2013 | Form 10-Q | Quarterly Report for 1Q13 | MetLife, Kandarian, Hele |
| August 7, 2013 | Form 10-Q | Quarterly Report for 2Q13 | MetLife, Kandarian, Hele |
| November 7, 2013 | Form 10-Q | Quarterly Report for 3Q13 | MetLife, Kandarian, Hele |
| May 8, 2014 | Form 10-Q | Quarterly Report for 1Q14 | MetLife, Kandarian, Hele |
| August 8, 2014 | Form 10-Q | Quarterly Report for 2Q14 | MetLife, Kandarian, Hele |
| November 6, 2014 | Form 10-Q | Quarterly Report for 3Q14 | MetLife, Kandarian, Hele |
| May 8, 2015 | Form 10-Q | Quarterly Report for 1Q15 | MetLife, Kandarian, Hele |
| August 6, 2015 | Form 10-Q | Quarterly Report for 2Q15 | MetLife, Kandarian, Hele |
| November 5, 2015 | Form 10-Q | Quarterly Report for 3Q15 | MetLife, Kandarian, Hele |
| May 6, 2016 | Form 10-Q | Quarterly Report for 1Q16 | MetLife, Kandarian, Hele |
| August 5, 2016 | Form 10-Q | Quarterly Report for 2Q16 | MetLife, Kandarian, Hele |
| November 3, 2016 | Form 10-Q | Quarterly Report for 3Q16 | MetLife, Kandarian, Hele |
| May 5, 2017 | Form 10-Q | Quarterly Report for 1Q17 | MetLife, Kandarian, Hele |
| August 4, 2017 | Form 10-Q | Quarterly Report for 2Q17 | MetLife, Kandarian, Hele |
| November 6, 2017 | Form 10-Q | Quarterly Report for 3Q17 | MetLife, Kandarian, Hele |

166. The false and misleading representations contained in MetLife's yearly and quarterly SEC filings made during the Class Period regarding effective internal controls were then falsely certified pursuant to SOX in these same MetLife SEC filings by defendants Kandarian and Hele.

167. Specifically, pursuant to §302 of the SOX, defendants Kandarian and Hele were obligated to certify that: (i) they were responsible for establishing, maintaining and regularly evaluating the effectiveness of the Company's internal controls; (ii) they made certain disclosures to MetLife's auditors and the Audit Committee of the Board about the Company's internal controls; and (iii) they included information in MetLife's yearly and quarterly SEC filings about their evaluation.

168. In addition, §906 of the SOX obligated defendants Kandarian and Hele to certify each periodic report containing financial statements filed by MetLife with the SEC pursuant to §§13(a) or 15(d) of the Exchange Act, 15 U.S.C. §78m(a) or §78o(d), and that information contained in the periodic report fairly presented, in all material respects, the financial condition and results of operations of the Company.

169. Given the Company's admissions of material weaknesses in internal controls as detailed in the 1/29/2018 Press Release and the Company's related filings made thereafter, defendants Kandarian and Hele's SOX certifications, in all material respects, falsely and misleadingly represented:

> ***1. I have reviewed this annual report on Form 10-K of MetLife, Inc.;***
>
> ***2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***
>
> ***3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

***5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

***a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

***b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

170. Although the quoted passage in ¶169 came from MetLife's Form 10-K filing for fiscal year 2012, dated February 27, 2013, MetLife and defendants Kandarian and Hele made the

same false SOX certifications in the following yearly and quarterly SEC filings issued during the Class Period:

| **Date** | **Type** | **Description** | **Speaker(s)** |
|---|---|---|---|
| February 27, 2013 | Form 10-K | Annual Report for FY12 | MetLife, Kandarian, Hele |
| May 7, 2013 | Form 10-Q | Quarterly Report for 1Q13 | MetLife, Kandarian, Hele |
| August 7, 2013 | Form 10-Q | Quarterly Report for 2Q13 | MetLife, Kandarian, Hele |
| November 7, 2013 | Form 10-Q | Quarterly Report for 3Q13 | MetLife, Kandarian, Hele |
| February 27, 2014 | Form 10-K | Annual Report for FY13 | MetLife, Kandarian, Hele |
| May 8, 2014 | Form 10-Q | Quarterly Report for 1Q14 | MetLife, Kandarian, Hele |
| August 8, 2014 | Form 10-Q | Quarterly Report for 2Q14 | MetLife, Kandarian, Hele |
| November 6, 2014 | Form 10-Q | Quarterly Report for 3Q14 | MetLife, Kandarian, Hele |
| February 27, 2015 | Form 10-K | Annual Report for FY14 | MetLife, Kandarian, Hele |
| May 8, 2015 | Form 10-Q | Quarterly Report for 1Q15 | MetLife, Kandarian, Hele |
| August 6, 2015 | Form 10-Q | Quarterly Report for 2Q15 | MetLife, Kandarian, Hele |
| November 5, 2015 | Form 10-Q | Quarterly Report for 3Q15 | MetLife, Kandarian, Hele |
| February 25, 2016 | Form 10-K | Annual Report for FY15 | MetLife, Kandarian, Hele |
| May 6, 2016 | Form 10-Q | Quarterly Report for 1Q16 | MetLife, Kandarian, Hele |
| August 5, 2016 | Form 10-Q | Quarterly Report for 2Q16 | MetLife, Kandarian, Hele |
| November 3, 2016 | Form 10-Q | Quarterly Report for 3Q16 | MetLife, Kandarian, Hele |
| March 1, 2017 | Form 10-K | Annual Report for FY16 | MetLife, Kandarian, Hele |
| May 5, 2017 | Form 10-Q | Quarterly Report for 1Q17 | MetLife, Kandarian, Hele |
| August 4, 2017 | Form 10-Q | Quarterly Report for 2Q17 | MetLife, Kandarian, Hele |
| November 6, 2017 | Form 10-Q | Quarterly Report for 3Q17 | MetLife, Kandarian, Hele |

171. Accordingly, MetLife and defendants Kandarian and Hele issued materially false and misleading statements in each SEC filing contained in the tables in ¶¶163, 65, 70 pertaining to the effectiveness of the Company's internal controls and the Company's compliance with SOX during the Class Period.

### C. Defendants' Accounting Reserves Statements During the Class Period Omitted Material Information

172. In addition to admitting that MetLife's financial statements violated GAAP and that the Company had material weaknesses in internal control over financial reporting at all relevant times during the Class Period, Defendants also admitted that MetLife understated accounting reserves due to MetLife's improper practice for locating pension risk transfer annuitants. This

violated GAAP, which requires financial adjustments to accounting reserves in the ordinary course to be corrected in financial statements on a prospective basis.

173. Defendants did not do that during the Class Period. Instead, MetLife made retroactive adjustments to its historical pension risk transfer accounting reserves, and then reissued the Company's previously issued financial statements, a process which, under GAAP, is only to be utilized when correcting mistakes and oversights or misuses of facts existing at the time the financial statements were prepared. Accordingly, MetLife's financial misstatements during the Class Period were not due to benign, incorrect judgments in calculating the Company's pension risk transfer accounting reserve estimates. *See, e.g.*, ASC No. 250 Accounting Changes and Error Correction.

174. MetLife is required by applicable accounting standards and legal requirements to maintain reserves sufficient to pay, among other annuitants, its pension risk transfer annuitants. Once MetLife incorrectly presumed that these annuitants were deceased, the Company released the related benefit amount from its accounting reserves, which Defendants have now admitted artificially inflated MetLife's historical profits by over $500 million.

175. Notwithstanding the foregoing, MetLife, at all relevant times during the Class Period, falsely and misleadingly assured investors that it had maintained adequate accounting reserves to meet the Company's obligations, including those for pension risk transfer annuitants.

176. Specifically, each yearly report that MetLife filed with the SEC during the Class Period contained the following materially false and misleading statements as they pertained to the Company's accounting reserves:

> Policyholder Liabilities
>
> We establish, and carry as liabilities, actuarially determined amounts that are calculated to meet our policy obligations when a policy matures or is surrendered, an insured dies or becomes disabled or upon the occurrence of other covered events, or to provide for future annuity payments. ***Our liabilities for future policy benefits and claims are established based on estimates by actuaries of how much we will need to***

> ***pay for future benefits and claims***. For life insurance and annuity products, we calculate these liabilities based on assumptions and estimates, including estimated premiums to be received over the assumed life of the policy, the timing of the event covered by the insurance policy, the amount of benefits or claims to be paid and the investment returns on the investments we make with the premiums we receive. ***We establish liabilities for claims and benefits based on assumptions and estimates of losses and liabilities incurred***. Amounts for actuarial liabilities are computed and reported in the consolidated financial statements in conformity with GAAP. For more details on policyholder liabilities see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Summary of Critical Accounting Estimates – Liability for Future Policy Benefits" and "Management's Discussion and Analysis of Financial Condition and Results of Operations – Policyholder Liabilities."
>
> Pursuant to state insurance laws and country regulators, MetLife, Inc.'s insurance subsidiaries establish statutory reserves, reported as liabilities, to meet their obligations on their respective policies. ***These statutory reserves are established in amounts sufficient to meet policy and contract obligations, when taken together with expected future premiums and interest at assumed rates***.
>
> * * *
>
> Policy and Contract Reserve Adequacy Analysis
>
> ***Annually, our U.S. insurance subsidiaries are required to conduct an analysis of the adequacy of all statutory reserves***. In each case, a qualified actuary must submit an opinion which states that the statutory reserves make adequate provision, according to accepted actuarial standards of practice, for the anticipated cash flows required by the contractual obligations and related expenses of the U.S. insurance subsidiary. The adequacy of the statutory reserves is considered in light of the assets held by the insurer with respect to such reserves and related actuarial items including, but not limited to, the investment earnings on such assets, and the consideration anticipated to be received and retained under the related policies and contracts. The Company may increase reserves in order to submit an opinion without qualification. ***Since inception of this requirement, our U.S. insurance subsidiaries which are required by their states of domicile to provide these opinions have provided such opinions without qualifications***.

177. Although the quoted passage in ¶176 came from MetLife's Form 10-K filing for fiscal year 2012, dated February 27, 2013, MetLife and defendants Kandarian and Hele made the same false statements about the Company's reserves in the following yearly and quarterly SEC filings issued during the Class Period:

| Date | Type | Description | Speaker(s) |
|---|---|---|---|
| February 27, 2013 | Form 10-K | Annual Report for FY12 | MetLife, Kandarian, Hele |
| February 27, 2014 | Form 10-K | Annual Report for FY13 | MetLife, Kandarian, Hele |
| February 27, 2015 | Form 10-K | Annual Report for FY14 | MetLife, Kandarian, Hele |
| February 25, 2016 | Form 10-K | Annual Report for FY15 | MetLife, Kandarian, Hele |
| March 1, 2017 | Form 10-K | Annual Report for FY16 | MetLife, Kandarian, Hele |

178. By speaking about the topic of MetLife's accounting reserves, which included those reserves designed to ensure that sufficient funds existed to compensate pension risk transfer annuitants, Defendants had a duty to speak fully and truthfully. Because Defendants failed to disclose that MetLife's accounting reserves were being improperly released due to the Company's practice of presuming that pension risk transfer annuitants were deceased without sufficient evidence to make that determination, and without cross-checking the SSA-DMF, as the Company did each month for other group annuitants, these statements omitted material information from MetLife's investors, thereby rendering each of these statements materially false and misleading.

179. Defendants' failure to adequately disclose an accurate portrayal of the Company's reserve practices for pension risk transfer annuitants during the Class Period in the SEC filings referenced in the table contained in ¶177 rendered these statements materially false and misleading.

### D. Defendants' Statements About the Company's Pension Risk Transfer Obligations Omitted Material Information

180. During the Class Period, Defendants often spoke about the Company's obligation to locate and compensate annuitants as being a critical component of its pension risk transfer business. Specifically, Defendants repeatedly stated that "***The Company fully guarantees [pension risk transfer] benefit payments and is ultimately responsible for all [pension risk transfer] benefit payments***."

181. This statement was disseminated by Defendants to investors in the following SEC filings made by MetLife during the Class Period:

| Date | Type | Description | Speaker(s) |
|---|---|---|---|
| February 27, 2014 | Form 10-K | Annual Report for FY13 | MetLife, Kandarian, Hele |
| February 27, 2015 | Form 10-K | Annual Report for FY14 | MetLife, Kandarian, Hele |
| May 21, 2015 | Form 8-K | Segment Reporting Changes and Other Updates | MetLife |
| February 25, 2016 | Form 10-K | Annual Report for FY15 | MetLife, Kandarian, Hele |
| November 18, 2016 | Form 8-K | Segment Reporting Changes and Other Updates | MetLife |
| March 1, 2017 | Form 10-K | Annual Report for FY16 | MetLife, Kandarian, Hele |

182. By speaking about the topic of MetLife's responsibility for paying pension risk transfer annuitants, Defendants had a duty to speak fully and truthfully. Because Defendants failed to disclose that MetLife's practice for locating pension risk transfer annuitants was improper and was causing the Company to not pay these annuitants, and the corresponding impact on the Company's financial performance, internal controls, and reserves that this improper practice was having at all relevant times during the Class Period, this statement omitted material information from MetLife's investors, thereby rendering each making of this statement materially false and misleading.

183. Defendants' failure to adequately disclose an accurate portrayal of the Company's ability to fulfill its responsibility to pay pension risk transfer annuitants during the Class Period in the SEC filings referenced in the table contained in ¶181 rendered this statement materially false and misleading.

184. In addition, during a MetLife investor conference call on December 12, 2014, defendant Wheeler, on behalf of MetLife, responded to an analyst's question about MetLife's view of the pension risk transfer business at that time. In providing his response, defendant Wheeler made the following materially false and misleading statements, stating, in pertinent part, as follows:

> **Jimmy Bhullar (J.P. Morgan Analyst)**: Good morning. Had a question for Bill. I think in your presentation you mentioned that for each $1 billion of pension closeout sales the earnings are equal to about $10 million. So relatively high ROE, and

assuming that equity's like close to 5% or 6% of assets, implies high teens ROE on that business. Does that make sense?

Related to that is when you have lost – you've done a few deals but obviously you've lost on a lot of the large deals that have been announced. So just wondering if you could talk in a little bit more detail on when you have lost deals in the pension closeout markets, has it been more because of pricing or is it capabilities or other things that have enabled some of your competitors to actually end up with a bigger market share over the past year or two years?

**Defendant Wheeler**: Jimmy, couple things. So in terms of incremental sales and earnings contribution and the relative ROE of that contribution, I think your rule of thumb of 5% to 6% capital allocation for a new closeout is probably a little low. It's probably closer to 7% or 8%. Each deal is a little different. The asset mix is a little different.

Remember, there's a lot of – there's some equities in those closeout portfolios to deal with the long-term liability. So the ROEs I think are still attractive. But they're not high teens, they're probably mid-teens, roughly. So that's sort of one.

In terms of how we feel about the market and the fact that even though we've had a lot of good success in terms of winning deals in, I would say, the mid-sized market, we have not been successful in the jumbo. One, there's not a lot of jumbo deals so it's a small group of data points.

I think the issue is is you see pricing -- I think pricing is the most important thing in terms of winning any closeout. I think capabilities matters. I think our capabilities in this market are as good as anyone's.

We have been in this market a long time and we have done a lot of deals over the years and ***we have invested a significant amount of money in a new administrative platform***. Remember, we're going to be administering these cases for literally decades. ***So you have to have the right kind of investment in technology to make sure that you can administer them effectively, gee, 15, 20 years from now***.

***So we've spent a lot of money in our new administrative platform to do that***.

185. By speaking about the related topics of: (i) MetLife's responsibility for administering payments to pension risk transfer annuitants; and (ii) investments that MetLife made to its administrative platform for this purpose, defendant Wheeler and MetLife had a duty to speak fully and truthfully. Because defendant Wheeler and MetLife failed to disclose that MetLife's practice for locating pension risk transfer annuitants was improper – which defendant Wheeler knew, or recklessly disregarded, as he was in charge of MetLife's U.S. business when: (i) the 2012 Settlement

Agreement specifically excluded pension risk transfer annuitants but caused the Company to update its practices for locating other annuitants; and (ii) MetLife was receiving monthly reports from the SSA-DMF to determine that group annuitants were deceased so that payments to them could be stopped, but ignored that those same reports did not contain the names of those pension risk transfer annuitants who were being improperly presumed as dead – and the corresponding impact on the Company's financial performance, internal controls, and reserves that this improper practice was having at all relevant times during the Class Period, these statements omitted material information from MetLife's investors, thereby rendering these statements materially false and misleading.

186. Defendants Wheeler's and MetLife's failures to adequately disclose an accurate portrayal of the Company's ability to fulfill its responsibility to pay pension risk transfer annuitants during the Class Period in the statements referenced in ¶184 rendered these statements materially false and misleading.

187. In addition, the statements made by defendants Wheeler and MetLife in ¶184 were materially false and misleading when made because MetLife had not invested in a new administrative platform for its pension risk transfer business. Instead, as the Company admitted at the end of the Class Period, at all relevant times before and during the Class Period the Company employed an improper practice for locating pension risk transfer annuitants that consisted of just two form letters and then, if no response was received, death was presumed. No other steps were taken. Accordingly, defendant Wheeler and MetLife's statements were materially false when made.

**E. Defendants' Statements About the 2012 Settlement Agreement Omitted Material Information**

188. At the beginning of the Class Period, Defendants discussed the Company's obligations to change its procedures for contacting certain annuitants pursuant to the 2012 Settlement

Agreement. Specifically, Defendants stated in the Company's Form 10-K for fiscal year 2012, filed on February 27, 2013, in pertinent part, as follows:

> In April 2012, the Company reached agreements with representatives of the U.S. jurisdictions that were conducting audits of MetLife, Inc. and certain of its affiliates for compliance with unclaimed property laws, and with state insurance regulators directly involved in a multistate targeted market conduct examination relating to claim-payment practices and compliance with unclaimed property laws. At December 31, 2012, the unclaimed property regulators of 39 states and the District of Columbia, and the insurance regulators of 48 states and the District of Columbia have accepted the respective agreements. ***Pursuant to the agreements, the Company will, among other things, take specified action to identify liabilities under*** life insurance, ***annuity***, and retained asset ***contracts, to adopt specified procedures for seeking to contact and pay owners of the identified liabilities***, and, to the extent that it is unable to locate such owners, to escheat these amounts with interest at a specified rate to the appropriate states.

189. The speakers of the statements in the Form 10-K referenced in ¶188 were defendants MetLife, Kandarian and Hele.

190. By speaking about the topic of MetLife's agreement to implement new procedures for locating annuitants, Defendants had a duty to speak fully and truthfully. Because Defendants failed to disclose that MetLife's practice for locating pension risk transfer annuitants was not being updated – and, instead, pension risk transfer annuitants were specifically excluded from the 2012 Settlement Agreement because the Company intended to continue to employ the improper practice of sending two form letters and then, if no response was received, presuming death for pension risk transfer annuitants without checking against the SSA-DMF, as the Company did each month to stop payments for group annuitants – and the corresponding impact on the Company's financial performance, internal controls, and reserves that this improper practice was having at all relevant times during the Class Period, these statements omitted material information from MetLife's investors, thereby rendering each making of these statements materially false and misleading.

191. Defendants' failure to adequately disclose an accurate portrayal of the Company's practice for locating pension risk transfer annuitants during the Class Period in the SEC filing referenced in ¶188 rendered these statements materially false and misleading.

**F. Omissions Based on Violations of Item 303 of SEC Regulation S-K [17 C.F.R. §229.303]**

192. Pursuant to Item 303, and the SEC's related interpretive releases thereto, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosure is required by an issuer in the management's discussion and analysis section of Forms 10-K and Forms 10-Q.

193. In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

194. Furthermore, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or

uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

195. Item 303 required the disclosure of known risks and uncertainties to MetLife presented by the Company's reliance on an improper practice for locating pension risk transfer annuitants. The Company did not make such required disclosures in the Forms 10-K and Forms 10-Q filed during the Class Period. The specific Forms 10-K and Forms 10-Q in which Defendants failed to comply with Item 303 are listed below:

| Date | Type | Description | Speaker(s) |
|---|---|---|---|
| February 27, 2013 | Form 10-K | Annual Report for FY12 | MetLife, Kandarian, Hele |
| May 7, 2013 | Form 10-Q | Quarterly Report for 1Q13 | MetLife, Kandarian, Hele |
| August 7, 2013 | Form 10-Q | Quarterly Report for 2Q13 | MetLife, Kandarian, Hele |
| November 7, 2013 | Form 10-Q | Quarterly Report for 3Q13 | MetLife, Kandarian, Hele |
| February 27, 2014 | Form 10-K | Annual Report for FY13 | MetLife, Kandarian, Hele |
| May 8, 2014 | Form 10-Q | Quarterly Report for 1Q14 | MetLife, Kandarian, Hele |
| August 8, 2014 | Form 10-Q | Quarterly Report for 2Q14 | MetLife, Kandarian, Hele |
| November 6, 2014 | Form 10-Q | Quarterly Report for 3Q14 | MetLife, Kandarian, Hele |
| February 27, 2015 | Form 10-K | Annual Report for FY14 | MetLife, Kandarian, Hele |
| May 8, 2015 | Form 10-Q | Quarterly Report for 1Q15 | MetLife, Kandarian, Hele |
| August 6, 2015 | Form 10-Q | Quarterly Report for 2Q15 | MetLife, Kandarian, Hele |
| November 5, 2015 | Form 10-Q | Quarterly Report for 3Q15 | MetLife, Kandarian, Hele |
| February 25, 2016 | Form 10-K | Annual Report for FY15 | MetLife, Kandarian, Hele |
| May 6, 2016 | Form 10-Q | Quarterly Report for 1Q16 | MetLife, Kandarian, Hele |
| August 5, 2016 | Form 10-Q | Quarterly Report for 2Q16 | MetLife, Kandarian, Hele |
| November 3, 2016 | Form 10-Q | Quarterly Report for 3Q16 | MetLife, Kandarian, Hele |
| March 1, 2017 | Form 10-K | Annual Report for FY16 | MetLife, Kandarian, Hele |
| May 5, 2017 | Form 10-Q | Quarterly Report for 1Q17 | MetLife, Kandarian, Hele |
| August 4, 2017 | Form 10-Q | Quarterly Report for 2Q17 | MetLife, Kandarian, Hele |
| November 6, 2017 | Form 10-Q | Quarterly Report for 3Q17 | MetLife, Kandarian, Hele |

196. The SEC filings referenced in the table in ¶195 did not mention any risks or uncertainties to the Company's business associated with relying on an improper and inadequate practice for locating pension risk transfer annuitants.

197. As detailed herein, however, the Company's practice for locating pension risk transfer annuitants was known to be improper at all relevant times throughout the Company, because: (i) the

Company acknowledged at the end of the Class Period that this practice was both improper and ongoing at all relevant times; and (ii) the Company's earnings benefitted from this practice throughout the Class Period, meaning Defendants knew that this improper practice was contributing to those earnings. The use of this improper practice presented risks and uncertainties to MetLife's business and operations given the uncertain – yet materially adverse – impact on MetLife that this practice for pension risk transfer annuitants could – and did – have.

## ADDITIONAL SCIENTER ALLEGATIONS

198. As alleged herein, MetLife and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding MetLife, their control over, and/or receipt and/or modification of MetLife's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning MetLife, participated in the fraudulent scheme alleged herein.

199. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

200. The Individual Defendants were each members of MetLife's executive management group during the Class Period. Based on their roles at MetLife, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

201. At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at MetLife, Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Class Period.

202. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

203. The allegations above also establish a strong inference that MetLife, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing MetLife's true operating

condition and present and expected financial performance from investors. By concealing these material facts from investors, MetLife maintained and/or increased its artificially inflated common stock price throughout the Class Period.

204. As executives of MetLife, the Individual Defendants, Lenna, Daniel, and Katz are all candidates for imputing corporate scienter to MetLife.

**LOSS CAUSATION/ECONOMIC LOSS**

205. As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MetLife's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of MetLife's common stock fell precipitously as the artificial inflation was removed.

206. As a result of their purchases of MetLife common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $55.73 per share on November 2, 2017.

207. On December 15, 2017, after the close of the trading day, MetLife issued the 12/15/2017 Form 8-K and announced, among other things, that the Company could have to materially increase its reserves because it had failed to compensate approximately 30,000 pension risk transfer annuitants before and during the Class Period.

208. In response to the aftermarket revelations on December 15, 2017, the trading price of MetLife's common stock declined from a close of $51.41 on Friday, December 15, to a close of $50.79 on Tuesday, December 18 – a decline of $0.62, or 1.2%. This decline eradicated

approximately $528 million of MetLife's market capitalization. The trading volume was unusually high, with trading volume of approximately 16 million shares traded, more than 2.5 times the average daily trading volume over the preceding year.

209. Then, after the close of the trading day on January 29, 2018, MetLife issued the 1/29/2018 Press Release and announced, among other things, that the Company's improper Class Period practice for locating pension risk transfer annuitants had caused a material weakness in internal control, would require the Company to increase its reserves by between $525 million and $575 million, and drew scrutiny from numerous regulators, including the SEC and NYDFS.

210. In response to the aftermarket revelations on January 29, 2018, the trading price of MetLife's common stock declined from a close of $54.40 on January 29, to a close of $48.07 on January 31 – a decline of $6.33, or 11.6%. This decline eradicated approximately $5.1 billion of MetLife's market capitalization. The trading volume was unusually high, with trading volume of approximately 30 million shares traded, more than 4.5 times the average daily trading volume over the preceding year.

211. As shown above, the timing and magnitude of the price declines in MetLife's common stock negate any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## CLASS ACTION ALLEGATIONS

212. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, as well as the officers and directors of the

Company and the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

213. The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, MetLife's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through discovery, Lead Plaintiffs believe there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MetLife or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

214. Lead Plaintiffs' claims are typical of the claims of members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

215. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

216. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act was violated by Defendants as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business and operations of MetLife;

(c) whether the trading price of the Company's common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

217. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS**

218. Lead Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

219. With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Lead Plaintiffs and other members of the Class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

220. At all relevant times, the market for MetLife's common stock was efficient for the following reasons, among others:

(a) the Company's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, MetLife filed periodic public reports with the SEC and the NYSE;

(c) MetLife regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) MetLife was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

221. As a result of the foregoing, the market for MetLife's common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of such common stock at artificially inflated prices, and a presumption of reliance applies.

222. In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding MetLife's business operations and

financial performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

223. Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

224. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Many of the statements herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

225. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

226. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

227. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of MetLife common stock during the Class Period.

228. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MetLife common stock. Lead Plaintiffs and the Class would not have purchased MetLife common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

229. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of MetLife common stock during the Class Period.

**COUNT II**

**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

230. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

231. The Individual Defendants acted as controlling persons of MetLife within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as

officers and/or directors of MetLife, the Individual Defendants had the power and authority to cause MetLife to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs respectfully pray for judgment as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as Class Representatives under Federal Rule of Civil Procedure 23, and appointing Lead Counsel as Class counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding Lead Plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

**JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

DATED: January 8, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MICHAEL G. CAPECI

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mcapeci@rgrdlaw.com

*Co-Lead Counsel for Plaintiffs*

MOTLEY RICE LLC
JAMES M. HUGHES (*pro hac vice*)
JOSHUA C. LITTLEJOHN (*pro hac vice* forthcoming)
CHRISTOPHER F. MORIARTY (*pro hac vice* forthcoming)
MEREDITH WEATHERBY (*pro hac vice* forthcoming)
ERIN C. WILLIAMS (*pro hac vice* forthcoming)
28 Bridgeside Blvd.
Mt. Pleasant SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jhughes@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
eweatherby@motleyrice.com
ecwilliams@motleyrice.com

*Co-Lead Counsel for Plaintiffs*

KENDALL LAW GROUP, PLLC
JOE KENDALL (*pro hac vice*)
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)

*Additional Counsel for Labourers' Pension Fund of Central and Eastern Canada*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 8, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*/s/ David A. Rosenfeld*

DAVID A. ROSENFELD

ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

E-mail: drosenfeld@rgrdlaw.com