Clerk's Office
Filed Date:

1/11/2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW
YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
CHRISTOPHER PARCHMANN,

Plaintiff,

v.

18 CV 780 (SJ) (RLM)

<u>MEMORANDUM AND ORDER</u>

METLIFE et al.

Defendant,
---------------------------------------------------X

A P P E A R A N C E S

ROBBINS GELLER RUDMAN & DOWD, LLP
58 South Service Road
Suite 200
Melville, NY 11747
By: David Avi Rosenfeld, Michael G. Capeci
*Attorney for Lead Plaintiff*

KENDALL LAW GROUP LLP
3811 Turtle Creek Blvd
Suite 1450
Dallas, TX 75219
By: Joe Kendall, Jamie McKey
*Attorney for Lead Plaintiff*

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
By: Elliot Greenfield, Maeve L. O'Connor, Johan Robert Abraham
*Attorney for Defendants*

JOHNSON, Senior District Judge:

Lead Plaintiff Labourers' Pension Fund of Central and Eastern Canada brings this securities fraud action asserting federal subject matter jurisdiction based on federal

question. 28 U.S.C. § 1331. Presently before the Court is Defendants MetLife, Inc., Steven A. Kandarian, and John C.R. Hele's (collectively, "Defendants") motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 101.) For the reasons that follow, Defendants' motion to dismiss with prejudice is GRANTED.

**BACKGROUND**

The following facts, drawn from the Complaint (Dkt. No. 96, the "Complaint") and the appended exhibits to Defendants' motion (Dkt. No. 101-2, the "Exhibit"), are assumed true for purpose of Defendants' motion to dismiss.

MetLife is a life insurance company that offers various annuity and employee benefit products. (Dkt. No. 96, ¶ 2; Dkt. No. 101-1, at 11.) One of them is pension risk transfer, which permits corporations to transfer their pension liabilities to professional pension risk management companies, such as MetLife. (Dkt. No. 96, ¶ 2.) This is the major product under one of MetLife's three business lines—Retirement and Income Solution ("RIS"). (Id. at ¶ 2.) MetLife and the corporation-employer enter into a group annuity contract, under which the employees become part of MetLife's group annuitants. (Id. at ¶ 45.) MetLife has established a liability, which is called accounting reserve, to account for the future policy benefits payable to its annuitants, including group annuitants under pension risk transfer. (Id. at ¶ 3.) If MetLife deems an annuitant dead, it will release her portion of future benefit from the reserve, thereby reducing the total amount of liability. (Id. at ¶ 3.) The method used by MetLife to determine whether a pension risk transfer group annuitant is still alive is sending her form letters twice, five years apart. (Id. at ¶ 6.)

If the annuitant fails to respond to the letters, she will be presumed dead and will not get paid by MetLife. (Id. at ¶ 6.)

On December 15, 2017, MetLife disclosed in her Form 8-K that the company failed to reach and pay a subset of her group annuitants, a population of 600,000. (Dkt. No. 101-2, Ex. A.) On January 29, 2018, MetLife ascertained that the mistakenly released reserve was related to RIS, and more specifically, to the practice and procedure adopted to estimate the reserves for the pension risk transfer group annuitants who did not respond to the form letters but were still alive. (Dkt. No. 101-2, Ex. B.) To compensate these annuitants, MetLife expected to increase her reserves by $525–575 million. (Id.) On March 1, 2018, in her Form 10-K filed for the fiscal year ended December 31, 2017, MetLife decided that the financial impact was however immaterial because of a coinciding accounting error, which had caused an overstatement of reserve, offsetting the expected increase in reserve. (Dkt. No. 101-2, Ex. D.) MetLife attributed the mistake to "operational failure" and "material weakness in internal control." (Dkt. No. 96, ¶ 138; Dkt. No. 101-2, Ex. B.) Stock price dropped immediately after the December 15, 2017 and January 29, 2018 disclosures. (Dkt. No. 96, ¶¶ 233, 235.)

Lead Plaintiff alleges that during the class period between February 27, 2013 and January 29, 2018, (i) Defendants made materially misleading statements on MetLife's financial condition; (ii) Defendants made materially misleading statements on MetLife's internal control; (iii) Defendants failed to disclose known uncertainty pursuant to 17 C.F.R. § 229.303 (Item 303); and (iv) as a result, individual Defendants, Kandarian as the Chief Executive Officer and Hele as the Chief Financial Officer, had control person liabilities.

**LEGAL STANDARDS**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to reasonably infer beyond mere possibility that the defendant is liable. Iqbal, 556 U.S. at 678. Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), to establish facial plausibility in securities fraud known as § 10(b) actions, the complaint must specify the misleading statements at stake, the reasons why they are misleading, as well as all the particular facts underlying such belief. 15 U.S.C. § 78u-4(b). In addition, plaintiff must also plead with particularity and give rise to a strong inference to defendant's required state of mind. Id. Congress adopted these more specific pleading requirements that highlight particularity under the umbrella of Iqbal to curb perceived abuses of § 10(b) private action. Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48 (2011) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (citation omitted)).

**DISCUSSION**

A few preliminary issues must be addressed before proceeding to analyze the substance of Lead Plaintiff's Complaint. One is the scope of the facts that can be taken into account at the motion to dismiss stage. The other is whether the statements at issue should be treated as opinions, which would demand additional proof of issuer's belief to establish

falsity. This Court will first determine the factual and legal framework within which the motion must be ruled upon.

**A. Preliminary Issue**

**a. Documents integral to the complaint**

Lead Plaintiff and Defendants dispute over whether MetLife's Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") and MetLife's correspondence with the Securities Exchange Commission ("SEC"), dated July 10, 2018, can be considered as part of the complaint. (Dkt. No. 101-2, Ex. D. & Ex. E.) Lead Plaintiff argues that these two documents should not be considered because the Complaint does not explicitly refer to them. (Dkt. No. 101-3, at 16–17.)

In addition to any exhibit attached to a complaint, "where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Nicosia, 834 F.3d at 230–32 (citing DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)). Although the Complaint does not cite directly the 2017 Form 10-K, the documents it cited and relied on, including Form 8-K dated December 15, 2017, MetLife's conference call dated January 29, 2018, and MetLife's earning call dated February 14, 2018, all defer to the 2017 Form 10-K as the ultimate factual determination, as opposed to mere expectation or prediction, of the restated financial results during the class period. (Id., Ex. A, Ex. B & Ex. C.) Lead Plaintiff's § 10(b) claim therefore heavily relies on the substance of the 2017 Form 10-K. As to the July 10, 2018 correspondence, Lead Plaintiff refers to the statistics disclosed in it as the particular facts allegedly

misstated, in an attempt to meet the pleading requirement. (Dkt. No. 96, ¶ 166.) The Court finds that these two documents are therefore integral to the Complaint.

**b. Opinion and factual statements**

Defendants claim that MetLife's statements on both her financial condition and her internal control are statements of opinions, and therefore subject to the rules set by the Supreme Court in Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 575 U.S. 175 (2015). Under 15 U.S.C. § 78u-4(b), a statement can be misleading either because of its falsity or because of omission of material facts that are necessary to make the statement not misleading. Omnicare requires that a statement of opinion be false only if the issuer does not genuinely believe what she says. 575 U.S. at 186. Unlike a statement of fact, factual falsity per se is not sufficient to make a statement of opinion false and hence misleading. Defendants argue that Lead Plaintiff failed to establish that MetLife did not believe the accuracy of the reserve estimate when making the financial statements. (Dkt. No. 101-1, at 17.) Defendants make similar arguments with respect to the internal control statements. (Id. at 18–20.)

Lead Plaintiff does not challenge Defendants' argument that MetLife's statements on internal control, including the Sarbanes-Oxley Act of 2002 Certifications ("SOX Certifications"), are opinion. (Dkt. No. 101-3, at 20.) Yet they reject such characterization of MetLife's financial statements. (Id. at 19.) No controlling opinion exists on that matter.

On one hand, a variety of reserves have been considered as statements of opinion because of their being actuarial estimates. (Dkt. No. 101-1, at 16–18). On the other hand, RIS reserves can be distinguished because its estimate is solely based on factual determination. (Dkt. No. 101-3, at 19.) This Court finds it unnecessary to rule on this issue,

because it is not dispositive in this case. As discussed below, Lead Plaintiff's claims can be dismissed on other grounds.

### B. Lead Plaintiff's Claim Under Securities Exchange Act § 10(b) and Securities and Exchange Commission Rule 10b-5

To recover damages for violations of § 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014) (citation omitted). At issue here are material misrepresentation or omission and scienter, both of which must meet the pleading requirement of the PSLRA, as well as loss causation.

This Court briefly addressed material misrepresentation or omission under the preliminary issues. In sum, be it a statement of fact or opinion, the Court must first determine whether it is false. Whether the Court needs to decide on the issuer's belief becomes relevant only if the statement is false. If it is not false, the Court must determine whether the issuer has failed to correct false assumptions a reasonable investor would make reading the statement. Omnicare, 575 U.S. at 193–94 ("[O]missions clause, as applied to statements of both opinion and fact, necessarily brings the reasonable person into the analysis, and asks what she would naturally understand a statement to convey beyond its literal meaning."). The issuer's belief then becomes irrelevant. Tongue v. Sanofi, 816 F.3d 199, 209–10 (2d Cir. 2016) ("But Omnicare went on to hold that opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor.") (citation omitted).

As for scienter, the required state of mind is "an intent to deceive, manipulate or defraud." Tellabs, 552 U.S. at 313 (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n. 12 (1976)). A strong inference of such state of mind as required by the PSLRA must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Id., at 309. However, it does not have to be irrefutable, or "of the smoking-gun genre," or the most plausible of all the competing inferences. Id., at 324. The test is "inherently comparative," because "[t]he strength of an inference cannot be decided in a vacuum. . . . [A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id., at 323–24. The key is whether "all of the facts alleged, taken collectively," could infer such an intent that is "at least as compelling as any opposing inference one could draw from the facts alleged." Id.

**a. Defendants' statement on MetLife's financial conditions**

Lead Plaintiff first alleges that all the financial statements in the Class Period were materially misstated because of "an improper recognition of over $500 million as *profits*" due to the wrongfully released reserves. (Dkt. No. 96, ¶¶ 5, 199) (emphasis added) In addition to this claim being potentially boilerplate, it misrepresents Defendants' statements. In the Form 8-K released on December 15, 2017, when MetLife first disclosed the relevant issues in her reserve estimate, she stated that the company "[did] not have an estimate at this point but . . . plan to provide further disclosure . . . in [the] annual report on Form 10-K for the year ended December 31, 2017." (Dkt. No. 101-2, Ex. A.) On January 29, 2018, MetLife disclosed that it was "*expect[ing]* to increase reserves [by more than $500 million] . . . *If actual facts and factors differ from those the company has assumed,*

*the reserve the company has established could be adversely or positively affected*." (Id., Ex. B.) (emphasis added) MetLife did not restate her financial statements or ascertain the change in reserves or profits yet before the stock price dropped.

Moreover, the restatement in the 2017 Form 10-K demonstrates no change in *profits*. Although MetLife increased reserves by $510 million to reinstate reserves mistakenly released, because MetLife detected calculation error in the valuation model of one of her former operating joint venture in Japan, which had resulted in an overstatement of reserves, the company also reduced the reserves by $896 million. (Id., Ex. D.) The restatement therefore resulted in no negative change in adjusted earning or net income available to common shareholders. (Id., Ex. E.) Lead Plaintiff is not able to prove that MetLife misstated the *profits*. Except for the unsuccessful attempt to exclude the documents, their only counterargument is that the investors did not know of the overstatement of reserves related to the Japanese joint venture when MetLife expected an increase in reserves on January 29, 2018. (Dkt. No. 101-3, at 18.) Investors' knowledge, however, is irrelevant to the factual falsity or truthfulness of the issuer's statement. In fact, by admitting their lack of knowledge of the offsetting factor, Lead Plaintiff also implicitly admits that the stock price drop was caused by an expectation of an absolute increase in liability and thereby a loss of profit, which did not happen, instead of an increase in RIS reserves per se. Therefore, all the § 10(b) claims based on the $500 million increase in reserves or allegedly related decrease in profits should be dismissed due to lack of falsity.

Lead Plaintiff then alleges that "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made," citing Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc., 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017).

(Dkt. No. 101-3, at 18–19) Even if this is the case, Lead Plaintiff did not provide any evidence of economic loss following the disclosure of the restated financial statements, which took place on March 1, 2018 when MetLife eventually filed the 2017 Form 10-K. (Dkt. No. 101-1, at 13–14.) Given the alleged facts, stock price only dropped twice, respectively on December 15, 2017 and January 29, 2018, both after and because of MetLife's projection of increase in reserves due to the mistakenly released RIS reserves, not for other potential accounting error. Therefore, Lead Plaintiff cannot build their § 10(b) claims upon the restatement per se.

The same reasoning can be applied to the restated financial results that are singled out by Lead Plaintiff. They allege in the Complaint that MetLife made false statements because:

> "[N]et income for the year ended Dec. 31, 2016 is overstated by 3%;
> net loss during the quarter ended Sept. 30, 2017 is understated by 10%;
> net income for the quarter ended June 30, 2016 is overstated by 5%."

(Dkt. No. 96, ¶ 166.) These statistics were first disclosed in MetLife's correspondence to the SEC, dated July 10, 2018. No economic loss followed the disclosure or non-disclosure of them back on March 1, 2018. Similarly, Lead Plaintiff has failed to plead loss causation for their allegation of an overstatement of net income by 200M in 2013 and 2014. (Id., ¶ 167.)

**b. Defendants' omission of material facts related to MetLife's method of estimate for RIS reserves**

Lead Plaintiff alleges that Defendants should but did not disclose that their practice of locating pension annuitants was not the same as adopted by other group annuitants. Two

kinds of omission are at issue. First is the initial misleading disclosure of the "2012 Settlement Agreement" in the Form 10-K for the fiscal year of 2012:

> At December 31, 2012, the unclaimed property regulators of 39 states and the District of Columbia, and the insurance regulators of 48 states and the District of Columbia have accepted the respective agreements. Pursuant to the agreements, the Company will, among other things, take specified action to identify liabilities under life insurance, annuity, and retained asset contracts, to adopt specified procedures for seeking to contact and pay owners of the identified liabilities, and, to the extent that it is unable to locate such owners, to escheat these amounts with interest at a specified rate to the appropriate states.

(Dkt. No. 96, ¶ 213.) (emphasis omitted) Defendants did not disclose that pension risk transfer group annuitants were exception to this agreement. (Id., ¶ 215.) Second is the ongoing non-disclosure of the practice of locating pension risk transfer group annuitants by two form letters over the class period. Lead Plaintiff pins this claim to MetLife's explanatory statement on her estimate of policyholder liabilities and policy and contract reserves. (Id., ¶¶ 201–03.)

These claims of omission of material fact should also be dismissed because Lead Plaintiff has failed to plead scienter. There are three ways to raise a strong inference of corporate scienter: (1) to impute it from an individual defendant who made the challenged misstatement, (2) to impute it from officers involved in the dissemination, even if they did not make the misstatement themselves, and (3) to directly infer a collective corporate scienter when the misstatement is extremely "dramatic." Jackson v. Abernathy, 960 F.3d 94, 98 (2d Cir. 2020) (citing Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195–96 (2d Cir. 2008)).

Under the PSLRA that requires pleading with particular facts and the Tellabs comparative analysis, neither the two individual Defendants, Kandarian and Hele, nor other

MetLife officers gives rise to a strong inference of scienter that can be imputed to MetLife. Lead Plaintiff has also failed to demonstrate how collective corporate scienter can be directly inferred from MetLife. Lead Plaintiff alleges that under the 2012 Settlement Agreement, MetLife agreed to follow up group annuitants who did not respond to the form letters by a "thorough search," including the use of electronic mail, certified mail, telephone, and various databases, to verify whether the annuitant is alive. (Dkt. No. 96, ¶ 81.) Yet MetLife explicitly excluded pension risk transfer annuitants from the applicable scope of the 2012 Settlement Agreement. (Id., ¶ 83.) Lead Plaintiff goes further by asserting that the exclusion and non-disclosure was intentional and for the specific purpose of deceiving the investors. (Id., ¶ 215.) This assertion, however, is lack of any evidentiary support. Lead Plaintiff provides testimonies on updated locating practices by MetLife officers who were in charge of other products. (Id., ¶¶ 36, 48, 50–51, 85–92, 100.) While they may draw the inference that Defendants were aware of different practices available, it is far-stretched and unfounded to infer that Defendants intentionally kept the flawed practice in place to defraud the investors. On contrary, an alternative inference of nonfraudulent intent that the individual Defendants did not see an issue in keeping the original form letter practice for pension risk transfer group annuitants would be more compelling, because it could be substantiated by the fact that the state regulators agreed to exclude it from the 2012 Settlement Agreement.

Furthermore, Defendants provide a competing theory of lack of knowledge by Kandarian and Hele, which is due to "material weakness in internal control," or in other words, "failure to timely escalate the relevant issues to the attention of MetLife's senior management." (Dkt. No. 101-1, at 10, 30–31; Dkt. No. 101-2, Ex. B.) Defendants launched

a "Pilot Program," through which internal control weakness was unveiled. (Dkt. No. 96, ¶¶ 103–04) Lead Plaintiff argues that scienter can be inferred from the fact that Defendants did not halt the practice when the Pilot Program was ongoing. This is self-contradicting as Lead Plaintiff did not explain how Defendants could learn of the issue before the conclusion of the Program. This alternative, nonfraudulent theory based on internal control is also more compelling than the inference of a fraudulent intent.

Neither did Lead Plaintiff offer any circumstantial evidence to substantiate their inference of intent. They repeatedly allege that MetLife's pension risk transfer is the market leader in its sector, as well as an area of growth and an attention-grabber in the corporation. (Id., ¶¶ 51–55.) Yet, merely showing that the product at issue is a key product of the business is insufficient to give rise to a strong inference of collective corporate scienter. Abernathy, 960 F.3d at 99 (citation omitted). Lead Plaintiff also calls to attention the resignation of the key officials as well as the reforms and sanctions imposed by the state regulators after the disclosure. (Dkt. No. 96, ¶¶ 131–41.) However, scienter must exist at the time the misleading statements were made, irrelevant to the knowledge gained in hindsight.

**c. Defendants' statement on MetLife's internal control**

As a fallback, Lead Plaintiff also alleges that Defendants made false statements with respect to MetLife's internal control. (Dkt. No. 96, ¶¶ 180–96.) At issue is whether the 2016 Audit Report, which is a piece of evidence for the above-mentioned Delaware case, can serve as evidence of scienter. According to the document provided by Defendants, the Audit Report addresses a different, unrelated issue. (Dkt. No. 98.) It is about unsent letters for deferred annuitants, an issue due to the deferred status and their

being not loaded to the system. (Id.) Moreover, the person held accountable for this issue, Eric Schwartz, has never been mentioned in Lead Plaintiff's filings. (Id.) Lead Plaintiff claims that this supplemental exhibit (Dkt. No. 98.) is "an entirely different document" from the one they actually refer to, yet they proceed to argue that both "the Report and Ex. A" suggest scienter. (Dkt. No. 99.) Defendants then refute by referring to the discussion in the above-mentioned Delaware District Court opinion. (Dkt. No. 106.) Because the credibility of Lead Plaintiff's allegation is contested, and Lead Plaintiff has failed to produce any specific document or evidence other than their own words to support their claim, it cannot be assumed to be true. See DiFolco, 622 F.3d at 111 ("[An integral document] must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."). Therefore, Lead Plaintiff has failed to plead scienter.

**d. Defendants' duty to disclose under Item 303**

SEC Regulation S-K, Item 303, requires disclosure of any known uncertainties that the issuer would reasonably expect to have material impact on its liquidity, revenues, or incomes. 17 C.F.R. § 229.303(a). Lead Plaintiff does not sufficiently plead how the uncertainties were known to Defendants. In fact, this claim depends on successful pleading of scienter under the § 10(b) claims. (Dkt. No. 96, ¶ 222.) Because Lead Plaintiff has failed to plead scienter, they also fail to plead their Item 303 claim.

**C. Plaintiff's Securities Exchange Act Rule 20(a) Controlling Person Liability Claim**

To plead controlling person liability, a plaintiff must show a primary violation by the controlled person. S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

Because this Court dismisses all the claims against MetLife, it is also going to dismiss controlling person liability claims against Kandarian and Hele.

## CONCLUSION

The Court has considered Lead Plaintiff's remaining arguments and finds them without merit. For the aforementioned reasons, Defendants' motion to dismiss with prejudice is GRANTED. The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: Brooklyn, New York
January 7, 2021

signed Sterling Johnson, Jr.,
Sterling Johnson, Jr., U.S.D.J.